**In the Interest of R.C., Minor Child.**

**Upon Petition of**

**J.R., Petitioner–Appellant,**

**and Concerning**

**E.C., Respondent–Appellee.**

**No. 88SA289.**

Supreme Court of Colorado,
En Banc.

June 5, 1989.

Holland & Hart, Frank P. Prager, R. Kirk Mueller, A. Bruce Jones, Denver, for petitioner-appellant.

Stephen J. Harhai, Laura E. Shapiro, Denver, for respondent-appellee.

VOLLACK, Justice.

In this case, we must decide whether section 19–4–106(2), 8B C.R.S. (1988 Supp.), precludes a sperm donor from asserting his parental status concerning a child conceived with an unmarried woman through artificial insemination. We conclude that the Denver County Juvenile Court erred in granting summary judgment in favor of E.C., the unmarried recipient of the donated sperm, and remand the case to the juvenile court for further hearings consistent with this opinion.

I.

J.R. and E.C. met in October 1983. Both J.R., the sperm donor, and E.C., the mother, were unmarried. J.R. said they were

"friends" while E.C. said they were "acquaintances."

In August 1985, E.C. discussed with J.R. the possibility of conception through artificial insemination. J.R. agreed to give his semen to her for use in artificial insemination. On September 25, 1985, he delivered the semen to her in a container. She took the semen to her gynecologist who artificially inseminated her that day. Two days later, E.C. called J.R. and asked him to provide her gynecologist with a second semen sample. J.R. delivered the second sample to E.C.'s gynecologist's office that day and E.C. was again artificially inseminated. E.C. became pregnant. Her son, R.C., was born in June 1986.

In August 1986, E.C. told J.R. that she had discovered that section 19–4–106(2) extinguished whatever right he may have had to be treated as the father of R.C. J.R. claims that E.C. said that she would not let him see R.C. again unless he signed a release of his parental rights. He refused to sign the release.

J.R. brought a paternity action in Denver Juvenile Court in April 1987. J.R. in pleadings and affidavits alleges a number of facts that are disputed by E.C.[1] He alleges that E.C. had been the one to solicit J.R. to donate his semen; that he donated the semen only because E.C. promised that J.R. would be treated as the father of any child conceived by the artificial insemination; that he had always wanted to father a child; that when he learned E.C. was pregnant, J.R. bought clothing, toys, and books for R.C.; that he opened a college trust fund for R.C. and furnished a room in his house as a nursery; that he "provided for [R.C.] in the event of [J.R.'s] death;" that he attended birthing classes with E.C.; that he was a "guest of honor" at E.C.'s baby showers; that he assisted in the delivery of R.C.; that he occasionally handled

night feedings of R.C.; that he "took care of [E.C.] and [R.C.] on a daily basis" during the first week of R.C.'s life; that E.C. both knew about and encouraged J.R.'s conduct; and that he intended to retain a parental relationship with R.C. at the time J.R. donated his semen.

E.C. filed a motion for summary judgment. She argued that whatever rights J.R. might have claimed as the biological father of R.C. were extinguished by section 19–4–106(2). Because J.R. conceded in his pleadings that he was a donor of semen, that E.C.'s gynecologist was a licensed physician, that he was not married to E.C., and that he provided the semen for use in E.C.'s artificial insemination, E.C. argued, J.R. must be treated in law as if he were not the natural father of R.C. She claimed that evidence surrounding the parties' agreement at the time he donated the semen was legally irrelevant because section 19–4–106 did not provide for consideration of such evidence. On that basis, E.C. sought to limit discovery to whether the statutory prerequisites for extinguishing J.R.'s parental rights were met. The juvenile court agreed to so limit discovery.

J.R. opposed the motion for summary judgment. He claimed that section 19–4–106(2) does not apply to known semen donors and unmarried recipients who mutually desire that the donor would retain his status as legal father of any child conceived through artificial insemination. He argued that evidence surrounding the agreement of J.R. and E.C. at the time of artificial insemination was relevant under his common law theory of promissory estoppel and that J.R. relied to his detriment on E.C.'s promise that J.R. would be treated as the father of R.C. He argued that if section 19–4–106(2) renders evidence surrounding the agreement of the parties irrelevant, then the statute is unconstitutional as applied as a violation of the equal pro-

---

1. E.C. contends that evidence of agreement is legally irrelevant under section 19–4–106 to resolving questions of paternity of a donor who provides semen to a licensed physician for use in artificial insemination of an unmarried woman. She argues, however, that a full disclosure of the facts would show that it was J.R.'s idea to donate his semen; that E.C. never promised J.R. that he would be treated as the father of any resulting child; that J.R. wanted no financial responsibility for any resulting child; that J.R. did nothing to become involved with R.C. before R.C.'s birth; that J.R. provided neither financial nor emotional support for R.C. or E.C. after R.C. was born; and that at all times E.C. advised J.R. to consult an attorney.

tection and due process clauses of the state and federal constitutions.

The juvenile court granted E.C.'s motion for summary judgment on May 31, 1988. It held that J.R. could not be treated as the natural father of R.C. because J.R. had donated his semen to E.C. for use in artificial insemination, because E.C. was not his wife, and because E.C. had used a licensed physician to insert J.R.'s semen. The juvenile court impliedly found that section 19-4-106 applied to known semen donors and unmarried recipients and expressly found that section 19-4-106 was not unconstitutional. The juvenile court did not address the validity of J.R.'s promissory estoppel claim.

J.R. appealed to the court of appeals. We transferred jurisdiction from the court of appeals to this court pursuant to C.A.R. 50(a)(3) because the issues presented are of such public importance as to justify the deviation from normal appellate processes and to require immediate determination in the supreme court.

## II.

J.R. does not contest the findings of the juvenile court that J.R. had donated his semen to E.C. for use in artificial insemination, that E.C. was not his wife, and that E.C. used a licensed physician to insert J.R.'s semen. We therefore do not address the propriety of these findings.

Before turning to the merits of the case, we first summarize the applicable law.

### A.

#### Rules of Statutory Construction

Our task in construing statutes is to ascertain and effectuate the intent of the General Assembly. *Ingram v. Cooper*, 698 P.2d 1314, 1315 (Colo.1985). Where the meaning is clear and no injustice would result, the statute must be interpreted as written without resort to other rules of statutory construction. *People v. District Court*, 713 P.2d 918, 921 (Colo.1986). Statutes susceptible of more than one interpretation, however, must be construed in light of the apparent legislative intent and pur-

pose. *Engelbrecht v. Hartford Accident & Indem. Co.*, 680 P.2d 231, 233 (Colo. 1984). Statutes must be read to give effect to both the letter and spirit of the act. *Clark v. Fellin*, 126 Colo. 519, 524, 251 P.2d 940, 943 (1952); *Great W. Mushroom Co. v. Industrial Comm'n*, 103 Colo. 39, 42, 82 P.2d 751, 752 (1938); *see also People in Interest of S.B.*, 742 P.2d 935, 938 (Colo. App.1987) (courts "should seek to promote the spirit of a statute and not simply the letter of the law"). *See generally* 2 N. Singer, *Sutherland Statutory Construction* § 54.03, at 565 (4th ed. 1985) (courts should always try to comply with the letter as well as the spirit of the law).

### B.

#### § 19-4-106 and § 5 of the Model UPA

■ The biological father is normally presumed to be the legal father of a child. § 19-4-105, 8B C.R.S. (1986) (rebuttable presumptions). The General Assembly has created a different set of presumptions under section 19-4-106, however, in order to determine parental rights concerning children conceived through artificial insemination. Section 19-4-106 provides:

**19-4-106. Artificial insemination.** (1) If, under the supervision of a licensed physician and with the consent of her husband, a wife is inseminated artificially with semen donated by a man not her husband, the husband is treated in law as if he were the natural father of a child thereby conceived. The husband's consent must be in writing and signed by him and his wife. The physician shall certify their signatures and the date of the insemination and shall file the husband's consent with the department of health, where it shall be kept confidential and in a sealed file; however, the physician's failure to do so does not affect the father and child relationship. All papers and records pertaining to the insemination, whether part of the permanent record of a court or of a file held by the supervising physician or elsewhere, are subject to inspection only upon an order of the court for good cause shown.

(2) The donor of semen provided to a licensed physician for use in artificial insemination of a woman other than the donor's wife is treated in law as if he were not the natural father of a child thereby conceived.

8B C.R.S. (1988 Supp.). The primary purpose of section 19-4-106 is to provide a legal mechanism for married and unmarried women to obtain a supply of semen for use in artificial insemination and, in the case of married recipients, to make clear that legal rights and duties of fatherhood are borne by the recipient's husband rather than the donor.

Section 19-4-106 is based on section 5 of the Uniform Parentage Act (model UPA) as approved by the National Conference of Commissioners on Uniform State Laws in 1973. With the important exception of the omission of the word "married" in subsection (2), section 19-4-106 of the Colorado UPA is a verbatim reproduction of section 5 of the model UPA.

One observer has described section 5 of the model UPA as "dealing superficially" with parental rights in a child born from artificial insemination. Rodgers, *Equal Protection for the Illegitimate Child: Uniform Parentage Act of 1977*, 6 Colo. Law. 1299, 1307 (1977). As the commentary to section 5 makes clear, section 5 of the model UPA was never intended to answer all questions concerning the rights of participants in artificial insemination. The commentary states:

This Act does not deal with many complex and serious legal problems raised by the practice of artificial insemination. It was though [sic] useful, however, to single out and cover in this Act at least one fact situation that occurs frequently.

Further consideration of other legal aspects of artificial insemination has been urged on the National Conference of Commissioners on Uniform State Laws and is recommended to state legislators.

*See* Comment, *The Need for Statutes Regulating Artificial Insemination by Donors*, 46 Ohio St. L.J. 1055, 1062-63 (1985) (section 5 of model UPA is a "skeletal" statute requiring state legislatures to give further consideration to other legal aspects of artificial insemination); Note, *Artificial Insemination and Surrogate Motherhood—A Nursery Full of Unresolved Questions*, 17 Willamette L.Rev. 912, 925 (1981) (section 5 "is merely a starting point for enacting legislatures"); *see also* Note, *Artificial Insemination: Donor Rights in Situations Involving Unmarried Recipients*, 26 J.Fam.L. 793, 796 (1988) (section 5 is "sketchy overall," "silent as to what its application would be for an unmarried woman," and "equally ambiguous in its treatment of the donor"). ·

The fact situation singled out by section 5 of the model UPA for its frequent recurrence is one in which a married woman is compelled to seek a supply of semen from someone other than her husband in order to conceive a child. *See C.M. v. C.C.*, 152 N.J.Super. 160, 161-163, 377 A.2d 821, 822 (1977); Bishop, *The Brave New World of Baby–Making*, 6 Cal.Law. 37, 38 (1986).[2] Section 5 of the model UPA resolves the specific legal conflict between a semen donor and the recipient's husband by providing that the recipient's husband "is treated in law as if he were the natural father of a child thereby conceived," *see* § 5(a), and by providing that the donor "is treated in law as if he were not the natural father of a child thereby conceived," *see* § 5(b).[3]

---

**2.** The limited factual context of section 5 of the UPA can also be seen from observations of Professor Krause, whose law review article "A Proposed Uniform Act on Legitimacy" was acknowledged in the Prefatory Note of the 1973 model UPA to be the "genesis" of the model UPA. Professor Krause stated in 1971 that the legislative response that "may point the way to the future" in delineating parental rights of semen donors and recipients was made in Oklahoma in 1967. That statute provided that a child born to a married woman as a conse-

quence of artificial insemination "performed" by an "authorized medical practitioner" using semen from a donor other than her husband is legitimate as to the husband. H. Krause, *Illegitimacy: Law and Social Policy* 19 (1971) (citing Okla.Stat.Ann. tit. 10 §§ 551-53 (1967)).

**3.** The 1971 discussion draft of section 5 of the model UPA also shows the limited factual context in which it was intended to apply. It provides:

SECTION 5. [*Artificial Insemination.*]

Whether section 5 of the model UPA was intended to extinguish parental rights of semen donors known to the woman is the subject of some debate. *Compare* Smith, *The Razor's Edge of Human Bonding: Artificial Fathers and Surrogate Mothers,* 5 W. New Eng.L.Rev. 639, 652 (1983) ("obvious" purpose of section 5 is "to protect anonymous [semen] donors from all legal responsibility for those children fathered as a consequence of their donation of semen") *and* Note, *Contracts to Bear a Child,* 66 Calif.L.Rev. 611, 614 (1978) (purpose of section 5 "is clearly to protect anonymous donors from legal responsibility for any children fathered by the use of their semen") *with* Kern & Ridolfi, *The Fourteenth Amendment's Protection of a Woman's Right To Be a Single Parent Through Artificial Insemination By Donor,* 7 Women's Rts.L.Rep. 251, 256 (1982) (although purpose is to protect anonymous semen donors from support obligations, section 5 "could also be raised by a mother seeking protection from a paternity suit by a donor" even when the donor was known to the mother).

## C.

### *Colorado UPA*

Colorado adopted the UPA in July 1977 with the passage of House Bill No. 1584. Ch. 245, secs. 1–3, §§ 19–6–101 to –129, 1977 Colo.Sess.Laws 1010, 1011–12 (now codified at §§ 19–4–101 to –129, 8B C.R.S. (1988 Supp.)). The portion of House Bill No. 1584 dealing with artificial insemination was introduced and passed without change using language identical to the present section 19–4–106.[4] As introduced,

> (a) If the husband has consented to artificial insemination of his wife, a resulting child is the legitimate child of the husband and wife. The husband's consent shall be in writing, acknowledged by two witnesses, and filed with the [registrar of births] where it shall be kept in a sealed file. The information contained in such file may be released only to persons having a justifiable interest therein as evidenced by a specific court order.
> (b) The donor of semen used in artificial insemination has no legally recognized relationship with a resulting child. An existing relationship is not affected.

House Bill No. 1584 omitted the reference to "married woman" found in section 5(b) of the model UPA in favor of the word "woman." The General Assembly offered no explanation for its omission of the word "married" from House Bill No. 1584. California in 1975 and Wyoming in 1977, however, had both omitted the word "married" from their versions of section 5 of the model UPA.[5] The California Court of Appeal offered the following interpretation of this change by the California legislature:

> Thus the California Legislature has afforded unmarried as well as married women a statutory vehicle for obtaining semen for artificial insemination without fear that the donor may claim paternity, and has likewise provided men with a statutory vehicle for donating semen to married and unmarried women alike without fear of liability for child support.

*Jhordan C. v. Mary K.,* 179 Cal.App.3d 386, 392, 224 Cal.Rptr. 530, 535 (1986). House Bill No. 1584 passed the House and Senate with minor changes unrelated to this dispute. No changes were made to the artificial insemination section of House Bill No. 1584. The legislative history of House Bill No. 1584 therefore offers no additional insight into the role the General Assembly intended an agreement between the parties to play when dealing with known donors and unmarried recipients under what is now section 19–4–106.

## D.

### *Case Law Concerning Artificial Insemination*

Only two jurisdictions have determined the parental rights of known donors and

*See* H. Krause, *Illegitimacy: Law and Social Policy* 243 (1971). The National Conference of Commissioners on Uniform State Laws gave no reason for its departure from the discussion draft.

4. When adopted, the Colorado artificial insemination statute was numbered § 19–6–106. The General Assembly repealed and reenacted § 19–6–106 in 1978 and again in 1987. It was renumbered in 1987 and can be found in the 1988 Supplement as § 19–4–106.

5. *See* Cal.Civil Code § 7005 (1986); Wyo.Stat. § 14–2–103 (1986).

unmarried recipients concerning children conceived by artificial insemination. In *C.M. v. C.C.*, 152 N.J.Super. 160, 377 A.2d 821 (1977), the New Jersey Superior Court determined that a known donor of semen who gave semen to an unmarried woman who artificially inseminated herself without the aid of a licensed physician was entitled to visitation rights of the resulting child. New Jersey had no applicable artificial insemination statute. The court found significant the facts that the woman and the donor had a long-standing dating relationship prior to her artificial insemination, that the child had "no one else who was in a position to assume the responsibilities of fatherhood when the child was conceived" because the woman was unmarried, and that the donor "fully intended to assume the responsibilities of parenthood" at the time of the insemination. *Id.* at 165–167, 377 A.2d at 824. The court stated that it is in a child's best interest to have two parents whenever possible. *Id.* at 167–168, 377 A.2d at 825. The court distinguished situations in which anonymous donors by virtue of their anonymous donation refuse to take on "the responsibilities of fatherhood" from situations in which the known donor not only consents but actively participates in the procedure leading to conception. *Id.*[6]

In *Jhordan C. v. Mary K.*, 179 Cal. App.3d 386, 224 Cal.Rptr. 530 (1986), the California Court of Appeal determined that the paternal rights of a known donor of semen to an unmarried woman who artificially inseminated herself without the help of a licensed physician were not extinguished by a statute identical to section 19–4–106. The facts in *Jhordan C.* were very similar to the facts in this case. Mary, an unmarried woman, decided to conceive a child through artificial insemination and raise the child with her friend Victoria. They chose Jhordan to supply the semen after a personal interview. Jhordan alleged that Mary had agreed that he would have "ongoing contact" with any child so conceived and would care for the child as often as two or three times a week. Mary denied that she and Jhordan had contemplated that Jhordan would have any future involvement with the child. Mary artificially inseminated herself without the involvement of a licensed physician and became pregnant.

Jhordan maintained contact with Mary after she became pregnant. He furnished a room in his house and started a trust fund for the child. His name was listed on the birth certificate as the father, and he visited the child several times after he was born.

Jhordan sought a determination of paternity after Mary asked him to relinquish his parental rights to the child. The trial court declared Jhordan to be the legal father of the child and granted him substantial visitation rights. Mary received sole custody of the child. Mary appealed, arguing that the artificial insemination statute extinguished whatever rights Jhordan may have had as the father of the child.

The California Court of Appeal affirmed the judgment of the trial court. The court interpreted the California artificial insemination statute as extending to unmarried women the protection afforded to married women under the UPA to use donated semen for use in artificial insemination without fear of paternity suits. *Id.* at 392, 224 Cal.Rptr. at 534. The court also noted that the statute likewise provides "men with a statutory vehicle for donating semen to married and unmarried women alike without fear of liability for child support." *Id.* It concluded that the statute did not extinguish Jhordan's parental rights, however, because Mary had failed to involve a licensed physician in the artificial insemination process. *Id.* at 394, 224 Cal.Rptr. at 535. The court held that because Mary failed to obtain Jhordan's semen through a licensed physician "and because the parties by all other conduct preserved Jhordan's status as a member of [the child's] family,"

---

6. The New Jersey legislature subsequently enacted a statute which provided that a donor of semen to someone other than his wife has no parental rights to a child conceived through artificial insemination unless the donor and the woman have entered into a written contract to the contrary. *See* N.J.Rev.Stat. § 9:17–44(b) (1988).

Jhordan was properly declared to be the child's legal father. *Id.* at 398, 224 Cal. Rptr. at 537–38.[7]

## III.

J.R. argues that section 19–4–106(2) does not preclude him from asserting parental rights because the statute was not intended to affect parental rights of known donors who gave their semen to unmarried recipients for use in artificial insemination with the mutual intent that the donor would retain his legal status as father of any child so conceived. He argues that an agreement that the donor would be the natural father can be construed as legally irrelevant only if section 19–4–106(2) creates an irrebuttable presumption of nonpaternity of the semen donor. Such an irrebuttable presumption would be unconstitutional, argues J.R., as a denial of due process and equal protection of the laws under the United States and Colorado Constitutions.

E.C. argues that section 19–4–106(2) does not create an irrebuttable presumption of nonpaternity. She contends that section 19–4–106(2) on its face extinguishes whatever parental rights J.R. might have claimed as the biological father of R.C. Because of this, she argues, any agreement that J.R. would be the natural father of R.C. would be illegal as a violation of public policy.

For purposes of reviewing the district court's grant of summary judgment in favor of E.C., we must accept as true the factual allegations of J.R. and determine whether E.C. is entitled to summary judgment as a matter of law. We must therefore decide whether agreement between a known semen donor and unmarried recipient that the donor would be the natural father of the child conceived through artificial insemination is a relevant consideration in determining parental rights under section 19–4–106.

The drafters of the model UPA plainly envisioned that an agreement that the donor would be the natural father is not a relevant consideration when the recipient is married and her husband consents in writing to the artificial insemination. Under section 19–4–106(1), the married recipient's husband is treated in law as if he were the natural father of the child so conceived. This is consistent with what one commentator has described as "the core premises of the UPA" of guaranteeing substantive legal equality for all children as well as identifying the father and enforcing the child's rights against him. Donovan, *The Uniform Parentage Age and Nonmarital Motherhood–By–Choice,* 11 Rev.L. & Soc. Change 193, 217 (1982).

Agreement is likewise not a relevant consideration when the semen donor is anonymous. As a practical matter, the donor and recipient would not know each other and could not agree to retain parental rights. More important, anonymous donors are not likely to donate semen if they can later be found liable for support obligations, and women are not likely to use donated semen from an anonymous source if they can later be forced to defend a custody suit and possibly share parental rights and duties with a stranger. *See Jhordan C.,* 179 Cal.App.3d at 392, 224 Cal.Rptr. at 535. Either possibility would undermine the primary purpose of section 19–4–106 of providing a source of semen to married and unmarried women for use in artificial insemination.

The role of an agreement between the parties under the model UPA and section 19–4–106 is least clearly understood when

---

**7.** The *Jhordan C.* case has been criticized by one observer as "an example of the confusion that may result from unclear legal guidelines" for its failure to differentiate the rights of known semen donors who have no intent or desire to retain parental rights from the rights of known semen donors who not only intend to retain parental rights but who are led to believe by the unmarried recipient they will be treated as the father of the child. *See* Note, *Artificial Insemi-nation: Donor Rights in Situations Involving Unmarried Recipients,* 26 J.Fam.L. 793, 799 (1988).

A growing number of legislatures have sought to clear up this confusion by enacting laws that extinguish parental rights of semen donors unless the donor acknowledges his paternity in writing. *See, e.g.,* Wash.Rev.Code § 26.26.050(2) (1979).

the semen donor is known and the recipient is unmarried. Legal disputes are most likely to arise in that circumstance because of the lack of statutory definition of the rights and duties of the donor and recipient. *See* Donovan, *The Uniform Parentage Age and Nonmarital Motherhood–By–Choice*, 11 Rev. of Law & Soc.Change 193, 217–18 (1982); Kern & Ridolfi, *The Fourteenth Amendment's Protection of a Woman's Right To Be a Single Parent through Artificial Insemination by Donor*, 7 Women's Rts.L.Rep. 251, 257 (1982); Note, *Artificial Insemination: Donor Rights in Situations Involving Unmarried Recipients*, 26 J.Fam.L. 793, 805–06 (1988). The commentary to section 5 of the model UPA demonstrates the statute's lack of guidance outside of the married recipient context. In extending the protection of section 19–4–106 to unmarried women without delineating the rights of the affected parties, the General Assembly failed to provide the guidance not employed by the model UPA. For these reasons, we conclude that section 19–4–106(2) is ambiguous with respect to the rights and duties of known donors and unmarried recipients.

A number of commentators have concluded that the intent of the known donor and unmarried recipient is relevant to a determination of parental rights under the model UPA. *See* Andrews, *Legal Aspects of New Reproductive Technologies*, 29 Clinical Obstetrics & Gynecology 190, 200 (1986) (as artificial insemination laws evolve, they "should take the approach of allowing the parties' preconception intent to govern paternity, possibly requiring that some documentation of that intent be filed with the state"); Kern & Ridolfi, *The Fourteenth Amendment's Protection of a Woman's Right To Be a Single Parent through Artificial Insemination by Donor*, 7 Women's Rts.L.Rep. 251, 256 (1982) (if custody suit between unmarried recipient and known donor were to arise, "the court may view the expectations (or intent) of the parties as relevant"); Vetri, *Reproductive Technologies and United States Law*, 37 Int'l & Comp.L.Q. 505, 514 (1988) ("We use the intent of the parties when the woman is married in determining parental responsibilities, and should do so in the rare cases when the woman is unmarried."); Note, *Artificial Insemination: Donor Rights in Situations Involving Unmarried Recipients*, 26 J.Fam.L. 793, 806 (1988) (in situations where a known donor is involved with an unmarried recipient, a court will consider "the familial expectations" of the donor "with the intention of the donor toward the resulting child at the time of insemination being a key factor"); *see also In re Marriage of Adams*, 174 Ill.App.3d 595, 610–611, 528 N.E.2d 1075, 1084 (1988) (despite absence of written consent by husband and statute providing that a husband "must" consent in writing to artificial insemination of wife, court could inquire into the circumstances surrounding the decision to artificially inseminate in order to determine whether husband intended to consent to procedure); Andrews, *Legal Aspects of Assisted Reproduction*, 54 Annals N.Y.Acad.Sci. 668, 674 (1988) (in thirty states by statute and in many other countries, "the preconception intent of the parties [in artificial insemination cases] governs who are the legal parents after the child is born").

The *C.M.* and *Jhordan C.* cases offer judicial insight into the role of an agreement in determining parental rights of known semen donors and unmarried recipients in artificial insemination cases. The *C.M.* court concluded that the known donor's "consent and active participation" in the artificial insemination procedure evinced an intent "to assume the responsibilities of parenthood." 152 N.J.Super. at 167–168, 377 A.2d at 825. The *Jhordan C.* court found that the known donor and the unmarried recipient "by all other conduct" preserved Jhordan's status as the father of the child. 179 Cal.App.3d at 398, 224 Cal. Rptr. at 537–38. While these cases are distinguishable for lack of comparable statutory guidelines in *C.M.* and failure of the unmarried recipient to involve a licensed physician in *Jhordan C.*, the result is inescapable that intent of the parties was a relevant consideration in determining whether the known donor's parental rights were extinguished.

We agree with the *Jhordan C.* court that an unmarried woman does not lose the protection of the artificial insemination statute merely because she knows the donor. As the California Court of Appeal noted, the advantages of choosing a known donor are significant.[8] Where, however, the unmarried recipient and the known donor at the time of insemination agree that the donor will be the natural father and act accordingly based on an express understanding that he will be treated as the father of any child so conceived, we concur with commentators, as well as the *Jhordan C.* and *C.M.* courts, that agreement and subsequent conduct are relevant to preserving the donor's parental rights despite the existence of the statute.

We interpret the General Assembly's omission of the word "married" from what is now section 19–4–106(2) as permitting unmarried women to share in the protection of the statute. Omission of the word "married," however, says nothing about the resulting rights and obligations of a known donor who provides his semen to a licensed physician for use in artificially inseminating an unmarried woman. While we agree with the *Jhordan C.* court that the artificial insemination statute protects semen donors from unanticipated child support obligations, we conclude that the General Assembly neither considered nor intended to affect the rights of known donors who gave their semen to unmarried women for use in artificial insemination with the agreement that the donor would be the father of any child so conceived. Section 19–4–106 simply does not apply in that circumstance.

### IV.

Because we conclude that section 19–4–106 does not apply when the known semen donor and the unmarried recipient agreed that the known donor would have parental rights and expressly agreed at the time of insemination that he would be treated as the natural father of any child so conceived, an agreement is relevant to whether J.R.'s parental rights were extinguished through the artificial insemination process. A factual dispute remains as to whether J.R. and E.C. at the time of insemination agreed that J.R. would be the natural father of R.C. This factual dispute must be resolved on remand. If no such agreement was present at the time of insemination, then section 19–4–106(2) operates to extinguish J.R.'s parental rights and duties concerning R.C. If such an agreement was present, then section 19–4–106(2) does not operate to extinguish J.R.'s parental rights and duties concerning R.C., and the juvenile court must determine paternity.

We do not reach the constitutional issues because of our resolution on statutory interpretation grounds.[9]

The judgment of the juvenile court is reversed and the case is remanded for further hearings consistent with this opinion.

KIRSHBAUM, J., specially concurs.

KIRSHBAUM, Justice, specially concurring:

I am in agreement with the majority opinion with the exception of part III thereof. The majority apparently views the issue to be whether the General Assembly intended section 19–4–106(2), 8B C.R.S. (1988 Supp.),[1] to apply to a donor who agrees with the donee that, contrary to the statute's provisions, the donor should be treated as the child's father. That view, however, suggests that the meaning of statutory terms can vary depending on pri-

---

8. *See Jhordan C.*, 179 Cal.App.3d at 394 n. 7, 224 Cal.Rptr. at 535 n. 7 (citing Kern & Ridolfi, *The Fourteenth Amendment's Protection of a Woman's Right To Be a Single Parent Through Artificial Insemination By Donor,* 7 Women's Rts.L. Rep. 251, 256 (1982)).

9. In light of our holding that the trial court should not have granted summary judgment in favor of E.C., J.R.'s promissory estoppel argu-

ment is premature. We therefore express no opinion as to its validity.

1. The statute in effect at the time this action was filed was codified as § 19–6–106, 8B C.R.S. (1986). That statute was repealed and reenacted in 1987 and is now codified at § 19–4–106, 8B C.R.S. (1988 Supp.).

vate agreements reached by some parties. Surely legislative intent cannot vary from case to case depending on the frame of mind of persons governed by that intent.

For similar reasons, I cannot accept the majority's suggestion that the drafters of the Uniform Parentage Act (the model UPA) envisioned that in one set of circumstances—when the donee is married and her husband consents in writing to the artificial insemination—an agreement by the parties would not be a "relevant consideration" in ascertaining the meaning of the statute. Slip op. at 33. The corollary of that proposition must be that in some other circumstances an agreement by the parties *would* be a "relevant consideration" in ascertaining the meaning of the statute. If the meaning of a statute in some but not all of its applications must be determined by reference to the intent of persons governed thereunder, the statute may not meet equal protection or due process standards.

The issue raised by J.R. can be viewed as a more generic question: whether parties whose rights and obligations are governed by a statute may waive those rights or obligations by agreement.[2] E.C.'s position seems to be that the agreement asserted by J.R. is unenforceable because any such agreement is contrary to the public policy established by section 19–4–106(2). I believe the trial court erred in determining that by its terms section 19–4–106(2) barred J.R. from asserting any parental rights to R.C. because in my view the statute is inapplicable to the circumstances of this case.

I find no ambiguity in the language of section 19–4–106(2): it bars any non-husband donor, known or unknown, from asserting any right of biological fatherhood to a child born by the donee, whether the donee is married or unmarried. However, I believe subsection (2) must be read together with that provision of subsection (1) expressly requiring that the artificial insemination process governed by statute be committed to the supervision of a licensed physician. If the process here was not supervised by a physician, the statute does not apply and E.C. may not rely upon its terms to bar J.R. from establishing that the parties reached an agreement concerning his parental rights.

The initial draft of the model UPA did not contain a provision requiring physician supervision of the artificial insemination process. H. Krause, *Illegitimacy: Law and Social Policy* 240, 243 (1971). However, the drafters ultimately chose to condition the model UPA's applicability to situations supervised by licensed physicians, no doubt in consideration of the inherent risks to all participants in the process, including the child. *See* Unif.Parentage Act § 5 comment, 9A U.L.A. 593 (1979), *citing* Wadlington, *Artificial Insemination: The Dangers of a Poorly Kept Secret*, 64 Nw. U.L.Rev. 777, 783 (1973).

Because the act of artificial insemination itself does not require medical expertise, it can reasonably be concluded that the requirement of physician supervision reflects a concern for the health of the donee and of the child and a desire to reduce the risks of genetic deficiencies in children born as a result of artificial insemination. *See Jhordan C. v. Mary K.*, 179 Cal.App.3d 386, 224 Cal.Rptr. 530 (1986). *See also* Vetri, *Reproductive Technologies and U.S. Law*, 37 Int'l & Comp.L.Q. 508, 518 (1988). Requiring physicians involved in this process to determine the blood characteristics of the donor and donee is not inconsistent with a physician's professional responsibilities in any parenting context. *See Id.* Statutes in Idaho, Ohio and Oregon establish minimum screening standards. Idaho Code §§ 39–5404 & 39–5408 (1985 & 1988 Supp.); Ohio Rev.Code Ann. § 311.35(2) (Anderson 1989); Or.Rev.Stat. § 677.370 (1987). *See* Andrews, *Legal Aspects of Assisted Reproduction*, 54 Annals N.Y.Acad. of Sciences 668, 671 (1988). In addition, a physician should no doubt conduct a physical examination of both donor and donee to ascertain whether medical harm will result to the

---

**2.** At least two states have adopted artificial insemination legislation specifically addressing issues arising from agreements between donors and donees. *See* N.J.Stat.Ann. § 9:17–44(b) (West 1989); Wash.Rev.Code Ann. § 26:26.050(2) (1987).

donee from the artificial insemination process and to protect the child from hereditary disease.[3] Hirsh & Palm, *Legal Implications of Artificial Conception*, 29 Medical Trial Tech.Q. 404, 407–08 (1982).

The General Assembly has not defined the scope of "supervision" required of the licensed physician whose participation in the artificial insemination process is a prerequisite for application of the provisions of section 19–4–106(1) and (2). A standard of reasonable professional conduct under all the circumstances may readily be implied, however. This is the standard of reasonable care by which physicians' professional conduct toward their patients has traditionally been measured at common law. Such conduct at a minimum must include determining the blood characteristics of the donor and donee and ascertaining whether the artificial insemination process might endanger the health of the donee or the child.

Although it appears that the physician here was not involved in supervising the artificial insemination process as contemplated by section 19–4–106(2), the trial court has not considered this question. In view of this circumstance, I believe the case should be remanded to the trial court for a determination of whether this particular process of artificial insemination was carried out under the supervision of a licensed physician. If it was not, the statute is inapplicable. If it was, the trial court must determine whether the parties reached an agreement that in effect insulated their conduct from the terms of the statute and, if so, whether such an agreement is enforceable.

For the foregoing reasons, I specially concur in the result reached in part III of the majority opinion.

**3.** According to one commentator, guidelines for screening donor semen have been promulgated by the American Fertility Society, the American Association of Tissue Banks and the Council of Ethical & Judicial Affairs of the American Medical Association. The author summarizes the guidelines suggested by the American Fertility Society as follows:

[The guidelines] recommend extensive infectious disease testing. They also recommend rejecting prospective donors or surrogates with a family history of nontrivial malformation, nontrivial Mendelian disorders, or a chromosomal rearrangement (unless the donor or surrogate has a normal karyotype). The donor or surrogate should not have (or have had) any disease with a known or reliably indicated major genetic component, such as asthma, juvenile diabetes mellitus, epileptic disorder, hypertension, a psychosis, rheumatoid arthritis, or a severe refractive disorder. The guidelines recommend screening donors for autosomal recessive disorders known to be prevalent in their ethnic group, and rejecting carriers. In addition to these definite reasons for rejection, there are certain conditions in relatives that should be *considered* as reasons for rejection (major psychoses, epileptic disorders, juvenile diabetes mellitus, and early coronary disease, mental retardation, neurologic disorders, unexplained deaths under age thirty, or significant congenital defects). The AFS also suggests that the Tay–Sachs trait should be screened for in Jewish donors or surrogates and sickle cell trait should be screened for in black donors or surrogates.

Andrews, *Legal Aspects of Assisted Reproduction*, 54 Annals N.Y.Acad. of Sciences 668, 672 (1988).