DENVER ASSOCIATION OF EDUCATIONAL OFFICE PERSONNEL, Plaintiff–Appellant and Cross–Appellee,

v.

SCHOOL DISTRICT NO. 1 IN the CITY AND COUNTY OF DENVER, State of Colorado; and the Board of Education of School District No. 1, Defendant–Appellee and Cross Appellant.

No. 96CA1491.

Colorado Court of Appeals, Div. II.

May 14, 1998.

Rehearing Denied June 11, 1998.

Certiorari Granted March 8, 1999.

William J. Maikovich, Aurora, Colorado; Martha R. Houser, Gregory J. Lawler, Sharyn E. Dreyer, Cathy L. Cooper, Bradley C. Bartels, Colorado Education Association, Denver, Colorado, for Plaintiff–Appellant and Cross–Appellee

Semple & Mooney, P.C., Martin Semple, Patrick B. Mooney, Denver, Colorado, for Defendant–Appellee and Cross–Appellant

Opinion by Judge JONES.

In this action alleging breach of a collective bargaining agreement, plaintiff, Denver Association of Educational Office Personnel (DAEOP), appeals from a judgment finding that it was not entitled to damages. Defendants, School District No. 1 in the City and County of Denver and its governing body, the Board of Education of School District No. 1 (collectively the School District), cross-appeal from a summary judgment entered in favor of DAEOP as to the issue of breach of contract. We reverse the summary judgment and, thus, need not address plaintiff's appeal.

This dispute concerns DAEOP's contention that the School District violated the parties' multi-year collective bargaining agreement and reclassification plan when it unlawfully denied DAEOP members a wage increase in September 1993.

DAEOP is the exclusive bargaining representative of a unit of noncertified employees of the School District. It entered into a collective bargaining agreement with the School District effective January 1, 1991, through August 31, 1994. The agreement governed the wages, salaries, hours, and other terms and conditions of employment of DAEOP members.

Article 14 of the agreement contains provisions regarding salaries. This article provides that then existing salaries of DAEOP members would be increased by 3.5% each year. It also provides that, if the parties should agree on a reclassification plan, the provisions of the plan would be in lieu of the scheduled salary increases for successive periods commencing, respectively, September 1991, 1992, and 1993. Following the execution of the collective bargaining agreement, the parties agreed upon such a reclassification plan.

In April 1993, the School District attempted to reopen negotiations concerning salary and wage provisions scheduled to take effect September 1, 1993. In a letter to DAEOP, dated April 8, 1993, the School District stated that it was requesting that the parties reopen negotiations because of an unexpected financial shortfall caused by the impact of Colo. Const. art. X, § 20 (TABOR Amendment), and the failure of the General Assembly fully to fund the School Finance Act for the 1993–1994 school year. The letter indicated that the need possibly to maintain "current salary levels by not implementing any salary increases for the 1993–1994 budget" was noted on April 1, 1993, in a meeting to review "the current status of the budget process" held by the district superintendent and the school board. While the record does not reflect that it challenged the underlying reasons for the School District's perceived need to reopen negotiations, DAEOP refused to negotiate pursuant to the request of the School District.

The School District subsequently adopted the previous year's salary schedules for the 1993–1994 school year instead of the schedule provided for in the reclassification agreement.

DAEOP filed suit, claiming that the School District had breached the collective bargaining agreement and school board policies by unlawfully refusing to pay the salary increases for the 1993–1994 school year.

The School District responded with a motion for summary judgment, arguing that its attempt to negotiate complied with the agreement and, therefore, that DAEOP had waived its right to relief by refusing to negotiate. DAEOP filed a cross-motion for partial summary judgment, arguing that the School District's request for negotiations was untimely and that, therefore, the School District's noncompliance with the salary provisions constituted a breach of contract.

The trial court granted DAEOP's motion and denied the School District's motion, finding that the School District had breached the collective bargaining agreement as a matter of law. A trial was held on the issue of damages, resulting, in part, in a finding that salaried employees were not entitled to damages. DAEOP subsequently filed a motion for a new trial, which the trial court denied.

On appeal, DAEOP asserts that the trial court erred in finding that DAEOP salaried members were not entitled to damages, in denying a motion to compel its request for discovery, and in denying its motion for a

new trial. On cross-appeal, the School District contends that the trial court erred in granting DAEOP's motion for summary judgment. We agree with the School District and, therefore, do not reach the merits of DAEOP's contentions.

◼ The School District contends that the trial court erred in granting summary judgment in favor of DAEOP on the issue of breach of contract. It argues that the trial court erroneously found that the School District did not comply with the collective bargaining agreement provisions concerning the reopening of negotiations and thereby breached the agreement by not instituting the agreed upon salary increase. We agree with the School District.

Article 4 of the collective bargaining agreement, governing annual negotiations, provides:

> Request for negotiations will be made by the Association to the Board, or by the Board to the Association, between March 1 and March 7 of each year during the term of this Agreement.

> . . . .

> 4.1.10 Tentative agreements reached as a result of such negotiations will be reduced to writing and will have conditional written approval of both parties pending final adoption and approval of the School District budget. After such adoption and approval, the final Agreement will be signed by the Board and Association and will become an addendum to this Agreement. *If changes in this tentative Agreement are necessary as a result of a legal budget adoption process, the Agreement will be subject to negotiation.* (emphasis added)

The trial court relied on the introductory language of this article to conclude that the School District was required to request negotiations between March 1 and March 7, and that, by failing to make a timely request, it waived its rights to bargain over wages.

The School District maintains that the provision in the agreement for a March 1 to March 7 negotiation period does not comply with § 22–32–110(5), C.R.S.1997, which requires that provisions for reopening negotia-

tions as to compensation be included in all multi-year collective bargaining agreements, and that, consequently, under certain circumstances, this language in the agreement cannot restrict the School District's ability to initiate negotiations regarding salaries past the March 7 deadline. Instead, the School District relies on the last sentence of § 4.1.10 as authorization to initiate negotiations after March 7 based on necessary changes in the budget. Again, we agree with the School District.

### A. Standard of Review

Summary judgment is a drastic remedy and will be granted only when the record clearly establishes the absence of any genuine issue of material fact. *Dominguez Reservoir Corp. v. Feil*, 854 P.2d 791 (Colo.1993). *See* C.R.C.P. 56. The parties contend, and we agree, that there are no genuine issues as to any material facts with respect to the issues before us and, thus, that this dispute may be determined by resolution of the parties' duties under the collective bargaining agreement.

◼ The construction of an unambiguous contract is a question of law for the court. *Fibreglas Fabricators, Inc. v. Kylberg*, 799 P.2d 371 (Colo.1990). In order to determine whether the trial court properly interpreted the collective bargaining agreement, we look primarily to the language of the agreement to determine and give effect to the intentions of the parties. *See USI Properties East, Inc. v. Simpson*, 938 P.2d 168 (Colo.1997).

◼ Written contracts that are complete and free from ambiguity will be found to express the intention of the parties and will be enforced according to their plain language. Extraneous evidence is admissible to prove that intent only when there is ambiguity in the terms of the contract. Moreover, ambiguity is not created merely because the parties disagree on the interpretation of the contract. *USI Properties, Inc. v. Simpson, supra.*

## B. *Construction of the Collective Bargaining Agreement*

■ Agreements reached between teachers' associations and school districts are intertwined with the public policy regarding public school spending, as codified in § 22–1–101, et seq., C.R.S.1997, because such agreements must yield to that legislatively established policy. *See Littleton Education Ass'n v. Arapahoe County School District No. 6,* 191 Colo. 411, 553 P.2d 793 (1976). Therefore, we must construe the collective bargaining agreement here in harmony with the codified public policy.

The guiding policy behind the statutes regarding school district funding is that of the prevention of deficit spending. Section 22–44–115(1), C.R.S.1997. Accordingly, the statute mandates that no school district may commit funds by contract which are in excess of an annual appropriation. *See* § 22–44–115(3), C.R.S.1997. In addition, school districts are required to adopt salary schedules and budgets on an annual basis. *See* § 22–63–401, C.R.S.1997.

The General Assembly has ensured that school districts comply with the requirements of § 22–44–115(3) and § 22–63–401 by requiring them to include a provision mandating annual negotiations in any contract concerning wages and salaries that exceeds one year in duration. This requirement, which is at the heart of the present dispute, is set forth at § 22–32–110(5), C.R.S.1997, and provides:

> No board of education shall enter into an agreement with any group, association, or organization representing employees of the district which commits revenues raised or received pursuant to Article 53 of this title for a period of time in excess of one year unless such agreement includes a provision which allows for the reopening of the portion of the agreement relating to salaries and benefits.

This statute was recently interpreted by a division of this court in *Denver Classroom Teachers Ass'n v. School District No. 1,* 911 P.2d 690 (Colo.App.1995)(*DCTA* ). Though written after the court here had acted, nevertheless, the opinion's interpretation of the statute is instructive in this case.

The dispute in the *DCTA* case arose from a factual situation that, in some respects, is similar to the one here. The teachers association filed suit against the school district and board of education, alleging breach of a collective bargaining agreement caused by the school district's failure to adopt a wage increase. As here, the school district attempted to renegotiate the salary provisions but the teachers association refused.

There, the court granted the school district's cross-motion for summary judgment on the ground that language in the contract complying with § 22–32–110(5) permitted the school district to initiate negotiations concerning salaries and benefits. As to the requirements of § 22–32–110(5), the court stated:

> These provisions of state law [§ 22–63–401 and § 22–44–115(3) ] made it incumbent upon the parties to allow for annual reopening of salary and benefit provisions that could *result from changes in the funds available to, or the needs of, the District.*

*DCTA, supra,* 911 P.2d at 695 (emphasis added).

The holding in *DCTA* suggests that in order to further the legislative intent behind § 22–32–110(5), contractual provisions allowing for annual negotiations must do more than simply provide for the reopening of negotiations during some agreed upon period each year. Rather, as specifically indicated in *DCTA,* the negotiation provision must have the flexibility to allow for adjustments in the agreement based on "changes in the funds available to, or needs of, the district." These "changes" are those produced by the budget adoption process at the state and local level, which process is, generally, outside of the control of either party to these kinds of collective bargaining agreements.

Furthermore, a restriction on the requirements necessary to satisfy § 22–32–110(5) is inconsistent with the legislative intent of the statutory scheme regarding school financing, to wit: to ensure that the state and the individual school districts maintain fiscal integrity and that they, in effect, not write a check in one year that they cannot cash in a

future year. Consequently, contractual negotiation provisions which do not provide the flexibility envisioned by the General Assembly, with respect to compensation and benefits, fail to promote the object of the law and, therefore, do not satisfy § 22–32–110(5). *See In Interest of R.C.*, 775 P.2d 27 (Colo.1989).

Here, the trial court found that the above-quoted language of Article 4 of the collective bargaining agreement, specifying the March 1 to March 7 period for requesting negotiations, complied with § 22–32–110(5).

However, the record reflects that the allotted negotiation period of March 1 to March 7 does not take into consideration that the annual budget of the school district typically is adopted after March 7, and indeed, after the General Assembly appropriates funding for the public schools. Hence, because this provision requires the school district to initiate negotiations regarding salaries and benefits before being apprised of any changes in its available funds, it cannot comply with the requirements of § 22–32–110(5).

We find, however, that the above-quoted language specifying that the agreement will be subject to negotiation as to compensation and benefits if changes are the result of a "legal budget adoption process" is consistent with the School Finance Act.

By its plain meaning, this language contemplates negotiations which necessarily result from changes in the budget. Furthermore, this language is identical to the contractual provision which the *DCTA* court found to be in compliance with § 22–32–110(5). Accordingly, we conclude that this provision permits either party to initiate negotiation of salaries and benefits when budget changes so require.

In addition, this provision permits the parties to initiate negotiations as to salaries and benefits in the narrow circumstance of budget changes. Therefore, it may be construed harmoniously with the introductory language in Article 4, which we interpret as a restriction on negotiations involving issues other than salary and benefits. *See Pepcol Manufacturing Co. v. Denver Union Corp.*, 687 P.2d 1310 (Colo.1984).

■ The record here indicates that the School District sought to reopen the agreement as to salaries after weighing the impact of the TABOR amendment, and after budget realities revealed that anticipated financial support would not be forthcoming, both of which factors made it extremely difficult for the School District to comply with the wage increase as contemplated by the agreement. Because we find that the School District's initiation of these negotiations was permissible pursuant to the language in Article 4.1.10 read *in pari materia* with relevant statutes, we conclude that, in refusing the School District's reasonable request to reopen negotiations, DAEOP waived its right to negotiate and that it must abide by the School District's determination of salaries for the 1993–94 school year.

■ In summary, based on the relevant statutes respecting School District budgeting and matters of salaries, wages, and benefits, we conclude that any provision of a multi-year collective bargaining agreement is void as against public policy and, therefore, unenforceable, if it limits any party to such agreement from requesting in good faith to reopen negotiations concerning issues of compensation and benefits within a reasonable period after that party becomes aware of the need therefor as a consequence of the legal budget adoption process at either the state or local level. The limitations set forth in such provisions, however, remain enforceable as to issues subject to negotiation other than compensation and benefits.

DAEOP's contentions are rendered moot by our reversal of the trial court's denial of the school district's motion for summary judgment and, therefore, we do not consider them.

The judgment is reversed, and the cause is remanded for entry of summary judgment in favor of the school district and against DAEOP, and for further proceedings consistent with this opinion.

TAUBMAN, J., concurs.

CRISWELL, J., dissents.

CRISWELL, Judge, dissenting.

In my view, the trial court correctly decided all of the issues presented to it. Hence, I dissent from the majority's reversal of the trial court's judgment.

On June 5, 1991, the parties (School District and DAEOP) entered into a written collective bargaining agreement. The agreement was made retroactive to January 1, 1991, and was to continue in effect until August 31, 1994—a term of some three years and eight months.

This agreement called for a salary increase for both salaried and hourly employees of 3.5%, retroactive to January 1, 1991. It also called for like 3.5% increases on the first day of September in 1991, 1992, and 1993. However, it required the parties to attempt to work out the details of a reclassification plan, and if they did so, the wage increases resulting from that plan would be in lieu of the increases called for by the agreement. It required that the cost of such reclassification plan would "not exceed the cost" of those negotiated increases.

One section of the parties' agreement, entitled "Annual Negotiations," contains some 18 subsections which, collectively, establish a detailed procedure to be used by the parties in their future negotiations. That procedure provides for the following:

—"[B]etween March 1 and March 7 of each year during the term of [the agreement]," either party may make a "request for negotiations." Such a request may relate to such subjects as "salaries, wages, hours and conditions of employment."

—The parties will then enter into negotiations which must be "finalized by June 1 of each year unless extended by mutual consent."

—"Tentative agreements reached as a result of such negotiations" are to be reduced to writing, and those agreements will have "the conditional written approval" of the parties, "pending final adoption and approval of the School District budget."

—However, if changes in "this tentative Agreement are necessary as a result of a legal budget process, the agreement will be subject to negotiation."

—After the final adoption and approval of any "tentative Agreement," the "final agreement" will be signed by the District and the Association, and it will become an "addendum to this Agreement." (all emphasis supplied)

It is undisputed that, after its negotiation in 1991, each of the parties signed the present agreement, and each implemented its terms.

In the late summer of 1991, representatives of the DAEOP presented a proposed reclassification plan to the School District for salaried employees only. In addition, the DAEOP contemplated that there would also be annual increases of 3.75% on September 1, 1992, and September 1, 1993, for those employees.

The total cost of the two negotiated annual increases of 3.5% for September 1992 and 1993 for these employees and the total cost of the reclassification plan alone were substantially equal. The cost of the proposed increases of 3.75% in 1992 and 1993, however, when added to the cost of the reclassification plan, would have increased the total costs to the School District during those two years by some $700,000.

The School District agreed to the reclassification plan, but its approval was based on the DAEOP's representation that its cost did not exceed the cost of the annual increases described in the agreement. It denied that it agreed to pay any additional costs.

Nevertheless, it gave its salaried employees a 3.75% raise, effective September 1, 1992. Later, however, when it computed its costs for such payment, it refused to give a similar increase in 1993.

In addition, on April 8, 1993, the School District wrote a letter to the DAEOP, saying that, as "strictly a precautionary measure," it wanted "to reopen, if necessary, the portions of the Collective Bargaining Agreements relating to salaries for the fiscal year 1993–1994." The DAEOP, however, refused to reopen the agreement, asserting that, because negotiations were to start in March 1994 for a new contract, it would "not be

beneficial" to enter into negotiations in the summer of 1993.

On September 1, 1993, the School District failed to provide to the hourly employees the 3.5% raise called for by the agreement. Likewise, the salaried employees did not receive the 3.75% raise that the DAEOP contends they were entitled to receive as of that date. And, these two failures led to the DAEOP's filing of its complaint in this case.

As to the claim of the salaried employees, who were the subject of the reclassification plan, the trial court, after a trial, determined that the parties did not have a meeting of the minds with respect to the 3.75% raise on September 1, 1993. It found, however, that both parties understood that the reclassification plan was to comply with the requirement that its cost not exceed the cost for the increases for which it was to substitute. Based upon this mutually acknowledged premise, the trial court concluded that the only reasonable interpretation to place upon the parties' agreement with respect to the reclassification plan was that the salaried employees were not entitled to any increases beyond those called for by that plan itself.

In my opinion, this conclusion is supported, if, indeed, not compelled, by the evidence in this case. Hence, while the majority does not reach this issue, it is clear to me that the trial court's judgment upon this question is entitled to affirmance.

In contrast, the trial court determined, on summary judgment, that, because the School District had failed to request negotiations in a timely fashion, i.e., "between March 1 and March 7," as the clear and unambiguous provisions of the parties' agreement required, it had no right not to honor the agreement that called for a 3.5% wage increase for hourly employees on September 1, 1993.

Relying upon *Denver Classroom Teachers Ass'n v. School District No. 1,* 911 P.2d 690 (Colo.App.1995) (*DCTA I*), the School District argues that the provision of the agreement requiring negotiations in the event that the "legal budget process" requires changes in the "tentative Agreement" required the DAEOP here to enter into negotiations to amend the existing agreement at any time that the School District asserted that some financial consideration warranted it.

I agree with the School District that the division in *DCTA I* concluded that the identical language in another agreement between the parties contained such a requirement. In my opinion, however, the division in *DCTA I* erred in reaching that conclusion.

The language of the parties' agreement respecting future negotiations is clear and unambiguous. If *either* party wants to reopen the agreement while it is in effect, a request therefor must be made between March 1 and March 7. Negotiations must commence at that time and be completed by June 1. Any further agreement reached, however, will be only "tentative," and the parties' approval will be "conditional" upon completion of the budget process. If that process does not require any amendments to the tentative agreement, the parties will sign it after the budget is adopted, and it will become the "final agreement." However, if the "tentative agreement" that the parties have previously only conditionally approved requires changes because of the budget process, the parties have agreed to negotiate changes to that agreement.

Under these provisions, the agreement at issue here is *not* a "tentative Agreement." It is an agreement that was finally approved, adopted, and signed by the parties in 1991. Its provisions requiring negotiation of a "tentative Agreement," therefore, have no applicability to the *existing* agreement. Those provisions refer only to a "tentative Agreement" reached by the parties as a result of *future* negotiations instituted pursuant to its terms.

In *DCTA I*, the agreement at issue, unlike the pertinent provisions here, did *not* authorize the School District to demand negotiations during its term; such negotiations could occur only by the "mutual consent" of both parties. Hence, unless the language referring to negotiations of a tentative agreement authorized the School District to "reopen" the underlying agreement, the agreement in that case would have been illegal under § 22–32–110(5), C.R.S.1997. Such consideration may have influenced the divi-

sion's construction of the agreement then before it.

Based on the plain language of the agreement here, however, I agree with the trial court that the provision authorizing negotiations over changes to a "tentative agreement" is not a provision authorizing further negotiations over the terms of the present agreement.

Consistent with that interpretation, I conclude that, because the agreement required the School District to make a demand for negotiations between March 1 and March 7 of any year, its demand on April 8 was untimely. Hence, I would also conclude that nothing in the parties' agreement required the DAEOP to honor the School District's untimely request to negotiate.

The issue presented, therefore, is whether § 22–32–110(5) required such negotiations. The majority concludes that it did. I disagree.

Section 22–32–110(5) is part of the statute that sets forth the powers and duties of a local board of education. It was added to those statutes in 1989, Colo. Sess. Laws 1989, ch. 184 at 965–966, and provides that:

No board of education shall enter into an agreement with any group, association, or organization, representing employees of the district which commits revenues raised or received pursuant to [the Public School Finance Act] for a period of time in excess of one year unless such agreement includes *a provision which allows for reopening* of the portion of the agreement relating to salaries and benefits. (emphasis supplied)

It is to be noted that this statute does not purport to dictate the terms of any "provision ... for reopening"; it merely requires that some provision be agreed upon by the parties to every multi-year collective bargaining agreement. While the statute itself does not expressly say so, I am willing to assume that it requires that any multi-year agreement allow for a reopening on an annual basis.

A provision allowing for "reopening" is one that is commonly found in a collective bargaining contract in the private sector. Such a provision commonly calls for the agreement to renew itself annually unless, on or before a specified time, one of the parties gives notice of a desire to modify or to terminate it. And, if a notice is not given in the manner or at the time called for, neither party has an obligation to negotiate any changes; the agreement continues in effect. *See Irwin v. Carpenters Health & Welfare Trust Fund,* 745 F.2d 553 (9th Cir.1984); *Salisbury v. Kroyer Heating & Air Conditioning,* 683 F.Supp. 177 (N.D.Ohio 1986). *See also* 29 U.S.C. § 158(d)(1)(1994) (National Labor Relations Act does not require a party to an existing agreement to negotiate changes unless written notice is given 60 days or more before termination date). Indeed, it has been said that the courts will "strictly construe" the language requiring such notice. *Irwin v. Carpenters & Welfare Trust Fund, supra,* 745 F.2d at 557.

I do not contend, of course, that the parties here are bound by the law relating to private employers and private labor organizations. I do suggest, however, that, at the time of the adoption of the pertinent statute, it was common for a bargaining agreement that "allows for reopening" to condition the right to reopen upon the presentation of a notice to the other party within a specified period.

Further, at the time of the adoption of § 22–32–110(5), the General Assembly was well aware that several of the school districts in the state had already executed multi-year contracts containing reopener clauses. *See* Tape Recording of Senate Debate on S.B. No. 256, 57th General Assembly, First Session (May 1, 1989).

Given these circumstances, then, I simply cannot conceive that, in enacting the simple requirement that a multi-year contract contain "*a* provision which allows for reopening," the General Assembly intended to prohibit local boards of education and local organizations representing their employees from agreeing upon a provision that follows the format of reopening provisions that are in common use.

The majority apparently agrees that the face of the statute does not reflect such an intent. However, it concludes, based on "the

legislative intent behind" the statute, that any reopener provision must allow a school district to renegotiate a presently existing agreement whenever it determines that there will be a "change" in the funds available to it. Hence, the majority concludes that such a provision must allow the School District to renegotiate even after the "budget process" has been completed. I detect no such legislative intent.

I note, first, that the majority has failed to describe what it is about "a provision which allows for the reopening" that it does not understand or which it claims is ambiguous. Yet, absent such a determination, reference to a statute's legislative history is inappropriate. *Mountain City Meat Co. v. Oqueda*, 919 P.2d 246 (Colo.1996); *People v. Andrews*, 871 P.2d 1199 (Colo.1994).

Nevertheless, even if it were proper to consider the legislative history, that history, I submit, does not support the majority's conclusion.

First, contrary to the impression given by the majority, the statute at issue here was not designed to grant authority to a school district that it did not previously possess. All school districts in this state have always had the authority to negotiate a provision that would allow a contract to be reopened at any time. And, they still possess that authority. Rather, as the Senate opponents to the bill that became § 22–32–110(5) argued, it *restricted* a local school district's authority.

Further, there is no indication either in the hearings on the pertinent bill or in the floor debates that the bill's proponents were motivated by some desire to protect local school districts from the effect of contract provisions that those districts might voluntarily agree upon. On the contrary, in the Senate debate, Senator Meiklejohn, a leading sponsor of the bill, emphasized that, under a reopening provision, either of the parties would be able to exercise the reopening right created by the agreement. *See* Tape Recording of Senate Debate on S.B. 256, 57th General Assembly, First Session (May 1, 1989).

The only substantive reason for the adoption of the statute was given by Senator Meikeljohn, who said that its adoption had been recommended by the Colorado Commission on School Finance. A review of that recommendation and of the commission's discussions leading to that recommendation do not reflect any desire to allow a school district to change a contract provision in light of new revenue forecasts. Rather, the recommendation arose from a concern that, so long as individual school districts could use a multi-year employee contract as a major reason to seek additional funding, disparities in funding among the various districts would continue. Hence, the commission staff initially recommended legislation that would have outlawed such multi-year contracts. The commission itself, however, modified this recommendation and recommended only that "all contracts over one year must contain a one-year reopener for salaries and benefits." *See* Staff Summary for Meetings of Colorado Commission on School Finance (December 13, 1988, and March 22, 1989).

Hence, the recommended legislation was intended to limit a school district's authority so that the basis for a district's request for additional funding would be eliminated. The underlying reasoning was that, if each school district were required to negotiate a yearly reopener clause, it could not then rely upon the existence of a multi-year contract to justify a request for further funding.

Nothing within any of these background materials suggests that, if a school district voluntarily negotiates a provision setting a time frame for either of the parties to reopen the agreement, but fails to observe those limits, the time limits will be unenforceable. All that is statutorily required is that the parties incorporate into their agreement a right to reopen that either of them may exercise.

Finally, to the extent that the statute does seek to allow changes to existing agreements as a result of budgetary changes, that purpose is fully served by the agreement at issue here. So long as a request to reopen is made in a timely fashion, that agreement requires negotiations and provides that no final agreement will result until the budget process is complete. While such a request must be made before all budgetary informa-

tion might be available, that poses no great obstacle. Indeed, the request actually made by the School District here was made as "a precautionary measure."

In my view, nothing within § 22–32–110(5) or its legislative history prevents the enforcement of the parties' voluntary agreement establishing a time limit within which a request to reopen negotiations must be made. Hence, I also conclude that the trial court's entry of judgment against the School District on this issue was proper.

However, I also agree with the trial court that the DAEOP was not entitled to a damage award based upon salaries paid to the employees represented by it after the terminal date of the pertinent agreement. As the trial court concluded, such damages would not have resulted from the breach of the present agreement. If higher wage rates were required to be paid after that date, it would be only because of some succeeding agreement that has not been placed in issue.

Based upon the foregoing, therefore, I would affirm the trial court's judgment.