152 N.J. Super. 160 (1977)
377 A.2d 821
C.M., PLAINTIFF,
v.
C.C., DEFENDANT.
Superior Court of New Jersey, Juvenile and Domestic Relations Court, Cumberland County.
July 19, 1977.
Mr. Robert E. Bailey for plaintiff.
Mr. Philip L. Lipman for defendant (Messrs. Lipman, Antonelli, Batt & Dunlap, attorneys).
TESTA, J.C.C., Temporarily Assigned.
This is a case of first impression, presenting a unique factual situation with no reported legal precedents directly on point, in this or any other jurisdiction.
*161 C.C. had a child who was conceived through the use of sperm donated by C.M.C.C. testified that she had been discussing with C.M. the possibility of having a child by artificial insemination, inquiring of him whether she should ask one of his friends to supply the sperm. C.M. suggested that he provide it and C.C. agreed to his suggestion. C.M. testified he and C.C. had been seeing each other for some time and were contemplating marriage. She wanted a child and wanted him to be the father, but did not want to have intercourse with him before their marriage. Therefore, he agreed to provide the sperm.
After the decision to have the child was made, the testimony of both parties are substantially the same. C.C. and C.M. went to a doctor who referred them to a sperm bank. The doctor at the sperm bank refused to allow its facilities to be used. However, C.C. learned, as a result of her conversation with the doctor, of a procedure for artificial insemination using a glass syringe and a glass jar.
Over a period of several months, C.C. went to C.M.'s apartment where they attempted the artificial insemination. C.M. would stay in one room while C.C. went to another room to attempt to inseminate herself with semen provided by C.M. After several attempts over a period of several months, C.C. did conceive a child.
C.M. testified that until C.C. was about three months pregnant, he assumed he would act toward the child in the same manner as most fathers act toward their children. C.C. denies this, testifying that C.M. was to be only a visitor in her home  much as any of her other friends. In either case, at that point the relationship between C.M. and C.C. broke off. This present application is a request by C.M. for visitation rights to the baby. His request is strenuously opposed by C.C.
A natural father is entitled to visitation rights with respect to his illegitimate children. See R v. F, 113 N.J. Super. 396 (Cty. Ct. 1971). The key issue in this case is whether C.M. is the natural father of the child or whether *162 he should be considered not to be such because the sperm used to conceive was transferred to C.C. by other than natural means. C.C. does not dispute that the sperm used to conceive the child was provided by C.M.
The question of who is the father of a child conceived by artificial insemination has been addressed by a few courts in the United States and has been addressed by authorities in the field of family law. In most cases the donor is unknown, and the issue involves whether the husband of the mother is, in fact, the father. In Strnad v. Strnad, 190 Misc. 786, 78 N.Y.S.2d 390 (Sup. Ct. 1948), the New York court considered a situation where a woman was artificially inseminated by a third-party donor with the consent of her husband. The court held that the husband was entitled to visitation, also holding that the child had been "potentially or semi-adopted by the defendant." The husband was "entitled to the same rights as that acquired by a foster parent who has formally adopted a child, if not the same rights as those to which a natural parent under the circumstances would be entitled." It was the court's opinion that if the mother was artificially inseminated with the consent of the husband, the child would not be illegitimate.
In 1963 a New York court considered the case of Gursky v. Gursky, 39 Misc.2d 1083, 242 N.Y.S.2d 406 (Sup. Ct. 1963). In that case an annulment was granted by the trial court because the husband was unable to consummate the marriage. When the couple had discovered the husband's infirmity, they decided that the wife should be artificially inseminated with the semen of a third-party donor. Both husband and wife signed the proper consent for the procedure. The husband agreed to pay all expenses and signed a contract for waiver of liability as well as for medical and/or surgical treatments. As a result of using the procedure a child was born. The birth certificate listed the wife as mother and the husband as father. The issue raised in the appellate court was whether the child was legitimate.
*163 The court discussed the Strnad case, but noting that the child had not been legally adopted, held that "the court's conclusion that the child was legitimate cannot logically be sustained." The court also quoted from an unreported case which said, "[w]here the precise issue of legitimacy has been squarely presented for determination, it has been held that heterologous artificial insemination by a third-party donor with or without the consent of the husband, constitutes adultery on the part of the mother and, that a child so conceived is not a child born in wedlock and is therefore illegitimate (Doornbos v. Doornbos, No. 54 S. 1498 [Superior Court, Cook Co., December 13, 1954])." The court in Gursky concluded (242 N.Y.S.2d at 410-411) that "the child in the instant case, which was indisputably the offspring of artificial insemination by a third-party donor with the consent of the mother's husband, is not the legitimate `issue' of the husband." However, the court held that in light of the husband's consent to the procedure, he was obligated to support the child, basing its decision on theories of implied contract and equitable estoppel.
A California court considered a similar situation in People v. Sorenson, 68 Cal.2d 280, 66 Cal. Rptr. 7, 437 P.2d 495 (Sup. Ct. 1968). In that case a sterile husband and his wife consented to her artificial insemination, resulting in the birth of a child. For the following four years they lived together in a normal family relationship. When the husband and wife were divorced the wife stated that she wanted no child support from her husband. However, under the divorce decree "the court retained jurisdiction regarding the possible support obligation of plaintiff in regard to a minor child born to defendant." Later, when the wife became ill and unable to work, she applied for public assistance, which was given to her until she was able to resume work. Although the district attorney demanded child support, her former husband did not support the child. A municipal court found him to be in violation of the state's *164 Penal Code and placed him on probation on condition that he make certain monthly payments for support.
In reaching a decision, the court noted that the determinative factor was whether the relationship of father and child existed. It stated:
* * * a child conceived through heterologous artificial insemination does not have a `natural father', as that term is commonly used. The anonymous donor of the sperm cannot be considered the "natural father," as he is no more responsible for the use made of his sperm than is the donor of blood or a kidney ... With the use of frozen semen, the donor may even be dead at the time the semen is used. [66 Cal. Rptr. at 10, 437 P.2d at 498]
At footnote 2, the court notes that there are two types of artificial insemination  one is with the husband's semen, and the other with that of a third-party donor. "Only the latter raises legal problems of fatherhood and legitimacy." Sorenson, supra, 66 Cal. Rptr. at 10, 437 P.2d at 498. The court stated that one who actively participated and consented to his wife's artificial insemination knew the legal responsibility of fatherhood and criminal responsibility for nonsupport. The court went on to state that
One who consents to the production of a child cannot create a temporary relation to be assumed and disclaimed at will, but the arrangement must be of such character as to impose an obligation of supporting those for whose existence he is directly responsible. As noted by the trial court, it is safe to assume that without defendant's active participation and consent, the child would not have been procreated. [66 Cal. Rptr. at 11, 437 P.2d at 498]
The court decided that the question of legitimacy of the child was properly left to the legislature, but noted that it was sufficient to find that the husband was the "lawful father" of the child to establish the responsibility to support. It held that the husband was the "lawful father."
A slightly different issue was addressed by a court in Adoption of Anonymous, 74 Misc.2d 99, 345 N.Y.S.2d 430 (Sup. Ct. 1973). In that case the husband consented to *165 artificial insemination of the wife and was listed as father on the birth certificate. The couple later separated and were divorced. Both the separation agreement and the divorce decree referred to the child as the "daughter" or "child" of the couple. Support and visitation were awarded and the husband faithfully supported and visited the child. When the wife later remarried, her second husband wanted to adopt the child. The proposed adoption was opposed by the first husband. The second husband argued that consent of the first should not be required as he was not the "parent" of the child.
The court in Adoption of Anonymous, as did the court in People v. Sorenson, supra, differentiates between artificial insemination using a husband's semen and that using the semen of a third-party donor. The first situation, it notes (345 N.Y.S. 2d at 430-431) "creates no legal problems since the child is considered the natural child of the husband and wife." The court concluded that Gursky, supra was not persuasive. It noted that New York had a "strong policy in favor of legitimacy" and held "that a child born of consensual [artificial insemination by a donor] during a valid marriage is a legitimate child entitled to the rights and privileges of a naturally conceived child of the same marriage." The court went on to hold that the first husband's consent was required for the adoption.
It is clear that the situation in the case at bar is different from that directly addressed in these cases. There is no married couple. There is no anonymous donor. Rather, we have a woman who chooses to have a baby and a man who chooses to provide the needed sperm, who are not married to each other and who choose a method of conception other than sexual intercourse. If the conception took place by intercourse, there would be no question that the "donor" would be the father. The issue becomes whether a man is any less a father because he provides the semen by a method different from that normally used.
*166 In the cases above, there are at least three people involved in the conception of the child  a woman, her husband and an anonymous donor. The cases mention a second possible situation  where a woman is artificially inseminated by her husband's own sperm. As we noted above, the courts in both People v. Sorenson and the Adoption of Anonymous stated that in the latter situation no legal issue was raised. In that situation the husband is clearly the father of the child.
The case at bar is more analogous to the second situation. In the first, there is competition over whether the husband or donor has the legal responsibility of fatherhood. The donor is unknown. In the second, there is no such competition. The husband and donor are the same person  and dictum, at least, tells us that there would be no question that such husband-donor would be the father.
Certain principles discussed in the earlier cases do shed some light on the instant case. In 1963 the court in Gursky, although refusing to label a child born of heterologous artificial insemination legitimate, did find that a husband consenting to his wife's insemination was obligated to support the child. In Sorenson, the California court held (66 Cal. Rptr. at 11, 437 P.2d at 499) that a husband who consented to a child's birth through artificial insemination, "cannot create a temporary relation to be assumed and disclaimed at will, but the arrangements must be of such character to impose an obligation of supporting those for whose existence he is directly responsible."
The courts have consistently shown a policy favoring the requirement that a child be provided with a father as well as a mother. In a situation where there is an anonymous donor the courts have required that the person who consents to the use of sperm, not his own, be responsible for fathering the child.
In this case there is a known man who is the donor. There is no husband. If the couple had been married and the husband's sperm was used artificially, he would be considered *167 the father. If a woman conceives a child by intercourse, the "donor" who is not married to the mother is no less a father than the man who is married to the mother. Likewise, if an unmarried woman conceives a child through artificial insemination from semen from a known man, that man cannot be considered to be less a father because he is not married to the woman.
When a husband consents to his wife's artificial insemination from an anonymous donor, he takes upon himself the responsibilities of fatherhood. By donating his semen anonymously, the donor impliedly gives it without taking on such responsibilities for its use. But here C.C. received semen from C.M., who was a friend  someone she had known for at least two years. The court finds that the evidence supports C.M.'s contention that he and C.C. had a long-standing dating relationship and he fully intended to assume the responsibilities of parenthood. There was no one else who was in a position to take upon himself the responsibilities of fatherhood when the child was conceived. The evidence does not adequately support C.C.'s contention, as argued by her attorney in his brief and stated in her testimony, that C.M. waived his parental rights.
It is in a child's best interests to have two parents whenever possible. The court takes no position as to the propriety of the use of artificial insemination between unmarried persons, but must be concerned with the best interests of the child in granting custody or visitation, and for such consideration will not make any distinction between a child conceived naturally or artificially. See DiBiano v. DiBiano, 105 N.J. Super. 415, 419 (App. Div. 1969); Sheehan v. Sheehan, 51 N.J. Super. 276 (App. Div. 1958). In this situation, a man wants to take upon himself the responsibility of being a father to a child he is responsible for helping to conceive. The evidence does not support C.C.'s argument that he is unfit. The evidence demonstrates that C.M. attempted to establish a relationship with the child but was thwarted in his attempts by C.C. Contrary to C.C.'s *168 argument, C.M. has shown a genuine interest in the child; he is a teacher and educationally able to aid his development, and is financially capable of contributing to his support. C.M.'s consent and active participation in the procedure leading to conception should place upon him the responsibilities of fatherhood. The court will not deny him the privileges of fatherhood. His motion for the right of visitation is granted. The court reserves the right to hold a hearing as to the period and manner of visitation on behalf of C.M.
Inasmuch as the court has found C.M. to be the natural father, the court must consider support and maintenance of the child and payment of any expenses incurred in his birth. Proper application shall be made by the parties to effect the above.