[No. B073747. Second Dist., Div. Seven. June 17, 1993.]

DEBORAH E. HECHT, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
WILLIAM EVERETT KANE, JR., et al., Real Parties in Interest.

## COUNSEL

Marvin L. Rudnick, Michael J. Partos and J. R. Nerone for Petitioner.

No appearance for Respondent.

Sandra McMahan Irwin, Bloom & Ruttenberg and Gary M. Ruttenberg for Real Parties in Interest.

## OPINION

**LILLIE, P. J.**—Petitioner, the girlfriend of decedent William E. Kane, seeks a peremptory writ of mandate/prohibition to vacate a January 4, 1993, order directing the personal representative of decedent's estate to destroy all of the decedent's sperm in the custody and control of California Cryobank, Inc. The real parties in interest are the administrator of the decedent's estate, (Robert L. Greene) and the decedent's adult son (William E. Kane, Jr.) and adult daughter (Katharine E. Kane). We issued an order to show cause and order staying execution of the January 4, 1993, order.

This proceeding presents several matters of first impression involving the disposition of cryogenically preserved sperm of a deceased. We conclude that the trial court's order constituted an abuse of discretion in the procedural posture of this case which compels us to set aside such order.

FACTUAL AND PROCEDURAL BACKGROUND

At the age of 48, William E. Kane took his own life on October 30, 1991, in a Las Vegas hotel. For about five years prior to his death, he had been living with petitioner, thirty-eight-year-old Deborah E. Hecht. Kane was survived by two college-age children of his former wife whom he had divorced in 1976.

In October 1991, decedent deposited 15 vials of his sperm in an account at California Cryobank, Inc., a Los Angeles sperm bank (hereinafter sperm bank). On September 24, 1991, he signed a "Specimen Storage Agreement" with sperm bank which provided in pertinent part that "In the event of the death of the client [William E. Kane], the client instructs the Cryobank to: . . . [¶] Continue to store [the specimens] upon request of the executor of the estate [or] [r]elease the specimens to the executor of the estate." A provision captioned "Authorization to Release Specimens" states, "I, William Everett Kane, . . . authorize the [sperm bank] to release my semen specimens (vials) to Deborah Ellen Hecht. I am also authorizing specimens to be released to recipient's physician Dr. Kathryn Moyer."[1]

On September 27, 1991, decedent executed a will which was filed with the Los Angeles County Superior Court and admitted to probate. The will named Hecht as executor of the estate, and provides, "I bequeath all right, title, and interest that I may have in any specimens of my sperm stored with any sperm bank or similar facility for storage to Deborah Ellen Hecht." A portion of the will entitled "Statement of Wishes" provided, "It being my intention that samples of my sperm will be stored at a sperm bank for the use of Deborah Ellen Hecht, should she so desire, it is my wish that, should [Hecht] become impregnated with my sperm, before or after my death, she disregard the wishes expressed in Paragraph 3 above [pertaining to disposition of decedent's "diplomas and framed mementoes,"] to the extent that she wishes to preserve any or all of my mementoes and diplomas and the like for our future child or children."

The will also bequeaths a home in Monterey County to Hecht and an adjoining seven-and-one-half-acre parcel of unimproved land to William E. Kane, Jr., and Katharine Kane, on condition that they deed and convey .4 acre of unimproved land adjacent to the home to Hecht. The residue of the estate was bequeathed to Hecht, the will stating, "I recognize that my

[1]On our record, it is unclear whether the "Authorization to Release Specimens" applies to the release of specimens only during Kane's lifetime or includes release of specimens after his death. It is also unclear whether the contract's reference to "executor" means Hecht. In light of the fact that decedent's will names Hecht as executor, decedent may have intended "executor" to refer to Hecht. However, for reasons not clear in our record, Hecht is not the present executor of the estate.

children . . . are financially secure and therefore leave them nothing other than the land included in this bequest, subject to the conditions as set forth above."

An October 21, 1991, letter signed by Kane and addressed to his children stated: "I address this to my children, because, although I have only two, Everett and Katy, it may be that Deborah will decide—as I hope she will—to have a child by me after my death. I've been assiduously generating frozen sperm samples for that eventuality. If she does, then this letter is for my posthumous offspring, as well, with the thought that I have loved you in my dreams, even though I never got to see you born. [¶] If you are receiving this letter, it means that I am dead—whether by my own hand or that of another makes very little difference. I feel that my time has come; and I wanted to leave you with something more than a dead enigma that was your father. [¶] . . . I am inordinately proud of who I have been—what I made of me. I'm so proud of that that I would rather take my own life now than be ground into a mediocre existence by my enemies—who, because of my mistakes and bravado have gained the power to finish me."

After several pages of childhood memories and family history, the letter stated: "So why am I checking out now? Basically, betrayal, over and over again, has made me tired. I've picked up some heavyweight enemies along the way—ranging from the Kellys of the world, to crazies with guns, to insurance companies, to the lawyers that have sucked me dry . . . . I don't want to die as a tired, perhaps defeated and bitter old man. I'd rather end it like I have lived it—on my time, when and where I will, and while my life is still an object of self-sculpture—a personal creation with which I am still proud. In truth, death for me is not the opposite of life; it is a form of life's punctuation."

Kane committed suicide on October 30, 1991, in Las Vegas, Nevada. On November 18, 1991, Robert L. Greene was appointed special administrator of the estate of William Everett Kane. On December 3, 1991, William Kane, Jr., and Katharine Kane each filed separate will contests.

On December 3, 1991, in open court, counsel for the special administrator orally placed on the record a "tentative agreement" to resolve "all matters relating to the estate between the children and Miss Hecht and to provide a 'global' resolution" pertaining to two will contests filed by the children and "one or two petitions under Probate Code [section] 9860 seeking the termination of title in the estate to various assets." Pursuant to the agreement, Hecht had in her possession and was to keep as her sole and separate property the sum of $80,000, an automobile, and some items of household

furniture; the children were entitled to keep some personal effects and furnishings located at decedent's rented property in Malibu and his Monterey County house, and were entitled to proceeds of an insurance policy. "The balance of all assets over which the decedent had dominion or control or ownership, whether in the possession of Miss Hecht, the children or any third party shall be subject to administration in the decedent's estate."

After payment of all specific bequests and debts and obligations, the parties agreed that "Sums in excess of $190,000 net available for distribution will be distributed 20 percent to Deborah Hecht, 40 percent to Katharine E. Kane and 40 percent to William Everett Kane, Jr." Further, "the parties will request that said last will and testament be admitted to probate subject to the terms of the formalized version of this stipulation." The foregoing stipulation was not to be binding until each of the parties and counsel discussed it and obtained approval; the reporter was also instructed to put signature lines at the bottom of the transcript for each party and his or her counsel. According to the copy of the transcript and signature page in our record, the stipulation was signed by William Kane, Jr., and Katharine Kane and her attorney. In court on December 6, 1991, Hecht stated that she agreed with the terms of the stipulation and her counsel indicated that Hecht had signed a copy of the reporter's transcript.

According to real parties, six months after the first settlement agreement of December 1991 (hereinafter First Settlement Agreement), Hecht's counsel attempted to claim the sperm from the sperm bank by letter; the sperm bank refused to release it to Hecht, who contacted the media and asserted claims to the sperm in that forum. Hecht alleges in the instant petition that real parties breached the First Settlement Agreement which is unenforceable and refiled their will contests in direct violation of the agreement. She also alleges that the First Settlement Agreement did not mention the decedent's sperm, which was not an "asset" of the estate and does not fall under the catch-all provision of the agreement because decedent gifted it to her before his death. Real parties William Kane, Jr., and Katharine Kane contended, and still contend, that the First Settlement Agreement is valid and binding.

In October 1992, the administrator of decedent's estate filed under Probate Code sections 9837 and 9860 "Petition for Order Authorizing Compromise and Settlement of Action by Estate and Authorizing and Directing Transfer of Property from Estate," which alleged that real parties and Hecht had entered into a settlement agreement and release (herein Second Settlement Agreement); pursuant to the Second Settlement Agreement, the estate will assign to Hecht any interest the estate may have in decedent's sperm, and Hecht will agree to "defend, indemnify, and hold harmless the Estate of

William Kane [and real parties, their heirs, successors, and assigns] from and against all claims, demands, and causes of action by or on behalf of any William Kane Unborn Child . . . ." The Second Settlement Agreement also provided in part that "This Agreement is subject to the condition subsequent of approval by the probate court on the application of Greene [administrator] for approval of this Agreement . . . ."

Hecht alleges that she, as well as William Kane, Jr., and Katharine Kane, signed the Second Settlement Agreement prior to October 10, 1992; on that date, at the hearing on the petition, an estate creditor named Barbara Kelly objected to the settlement, and the court set the matter for trial. According to Hecht, decedent's children attempted to withdraw from the Second Settlement Agreement but the court refused to permit such withdrawal, ruling that the interested parties were entitled to trial on the confirmation of the Second Settlement Agreement. According to the children, they effectively withdrew from the agreement because it had never become binding on the parties because not signed by Greene and approved by the court.

On November 5, 1992, Greene, as administrator, filed a "Petition for Alternative Relief (Instructions to Destroy Decedent's Frozen Sperm or Order for Preliminary Distribution of Said Sperm and Order of Determination of Whether Children Conceived from Said Sperm Shall Be Entitled to Distribution and Instructions Concerning Administration of Estate Pending Conception and Birth of Said Children)." Greene sought relief under Probate Code section 9611 (instruction from or confirmation by court), section 11620 (petition for preliminary distribution) and section 11700 (petition for determination of persons entitled to distribution), stating in his petition that "decedent's children have requested that Petitioner Petition this Court for Instructions to order the sperm destroyed, on public policy grounds, or in the alternative, for an Order for preliminary distribution of either 100 percent or 80 percent of the sperm to them upon alternative theories of entitlement. These theories include a claim based on the children's being the next of kin to the decedent and his sperm and claims based upon the terms of the Settlement Agreement."

Greene requested the court to select one of four alternative dispositions: (1) order destruction of the sperm; (2) order distribution of the sperm to decedent's children; (3) order distribution of 80 percent of the sperm to decedent's children and 20 percent to Hecht, and determine whether any children subsequently conceived by use of the sperm shall be entitled to distribution of estate assets; and (4) order distribution of the sperm to Hecht, but reserve one or two vials for future DNA/paternity testing, and determine to what extent any children subsequently conceived shall be entitled to estate assets.

Real parties Katharine Kane and William Kane, Jr., filed a statement of interested parties in which they argued that ordering destruction of decedent's sperm would "help guard the family unit in two different ways": First, such an order would prevent the birth of children who will never know their father and "never even have the slightest hope of being raised in a traditional family." Second, such an order would "prevent the disruption of existing families by after-born children," and would "prevent additional emotional, psychological and financial stress on those family members already in existence." They characterized the desire to father children after one's death as "egotistic and irresponsible," and stated that they "have lost their father to a tragic death which Hecht could easily have prevented; they do not wish to suffer any more at her hands. Further, they do not wish to be troubled for the rest of their lives with worries about the fate of their half-sibling(s)."[2]

Hecht filed a brief in response to the administrator's petition. She argued that neither the estate nor the children currently hold any property interest in, or right to distribution of, the sperm; it was gifted to her at the time of its deposit into the sperm bank and is either an inter vivos gift or a gift causa mortis. Hecht also maintained that even if the semen is an asset of the estate, the estate should be directed to distribute it to her because (1) the parties entered into a settlement agreement providing she is entitled to sole possession and control of the semen; (2) the will specifically directs that she is to be the sole beneficiary of the sperm; (3) destruction of the semen against her wishes would violate her rights to privacy and procreation under the federal and California Constitutions; and (4) she faces irreparable harm if the semen is not quickly distributed to her because her "advanced maternal age" will adversely affect her ability to conceive using the semen.

At the December 9, 1992, hearing on the petition, the court ordered that the sperm be destroyed.[3] On January 4, 1993, the court entered an order authorizing and directing the administrator "to destroy all of the decedent's

---

[2]On November 12, 1992, decedent's children filed against Hecht a first amended complaint for wrongful death and intentional enfliction of emotional distress, wherein they alleged, inter alia, that their father, who had been unemployed for some time, became deeply depressed and began to seriously contemplate suicide about September 1, 1991; for six weeks before his death, Hecht was aware of decedent's "disturbed plan" to end his life; that Hecht convinced him to allow her to have his child after his death and to leave her a substantial amount of his property to raise and care for this child; in the week before his death, Hecht encouraged and assisted decedent in transferring property to her and decedent emptied his personal checking account by issuing a check to Hecht for $80,000; Hecht assisted decedent in purchasing a one-way ticket to Las Vegas and took him to the airport.

[3]When Hecht's counsel asked for the legal basis of the ruling, the court stated, "It really does not matter, does it? If I am right, I am right and if I am wrong, I am wrong. As you know, I am persuaded by the arguments in the moving papers. This is something that is going to have to be decided by the appellate courts. Let's get a decision." Before ruling, the court

sperm in the custody and control of California Cryobank, Inc., and in connection therewith, to instruct California Cryobank, Inc., to destroy all of the decedent's sperm in its custody and control." On March 5, 1993, Hecht filed in this court a petition for peremptory writ of mandate/prohibition to vacate the January 4, 1993, order, and requested an immediate stay. Although the trial court's order stayed execution for 60 days, on March 8, 1993, we issued an order staying execution of the January 4, 1993 order. On March 25, 1993, we issued order to show cause; oral argument has been had thereon.

I

PROBATE PRINCIPLES

■ "All proceedings in the probate court are limited and special or limited and statutory. [Citation.] The power of the probate court extends only to the property of the decedent." (*Estate of Lee* (1981) 124 Cal.App.3d 687, 692 [177 Cal.Rptr. 229].) The right of inheritance, as well as the right of testamentary disposition, is entirely within the control of the state Legislature and is subject only to the conditions prescribed by such body. (*Harkness* v. *Harkness* (1962) 205 Cal.App.2d 510, 516 [23 Cal.Rptr. 175].) "Whether this accords with natural right and justice is a question upon which we cannot enter. The right of inheritance in this state does not depend upon the ideas of court or counsel as to justice and natural right. The entire matter is in the control of the legislature . . . ." (*Id.* at pp. 515-516, internal quotation marks omitted.)

" 'Except as expressly provided by law, the probate court has no jurisdiction to distribute a decedent's estate except to heirs, devisees, or legatees.' " (*Estate of Muhammad* (1971) 16 Cal.App.3d 726, 732-733 [94 Cal.Rptr. 856].) ■ "[T]he executor or administrator occupies a fiduciary relationship in respect to all parties having an interest in the estate including heirs, beneficiaries under the will, and creditors [citations] and, as a fiduciary, has the duty towards such parties to protect their legal rights in the estate [citations]." (*Nathanson* v. *Superior Court* (1974) 12 Cal.3d 355, 364-365 [115 Cal.Rptr. 783, 525 P.2d 687].)

■ "Section 588 [the predecessor to Probate Code section 9611] does not provide a method for determining who will be entitled to distribution of the assets of an estate. [Citation.] For a stronger reason it cannot provide a

also stated, "Obviously we are all agreed that we are forging new frontiers because science has run ahead of common law. And we have got to have some sort of appellate decision telling us what rights are in these uncharted territories."

method for determining who are entitled to share in property that is not part of an estate. [¶] . . . [S]ection 588 does not confer jurisdiction on the probate court that it would not otherwise have to try title to property." (*Estate of Cox* (1970) 8 Cal.App.3d 168, 185 [87 Cal.Rptr. 55].)

In light of the foregoing principles, we conclude that we cannot uphold the trial court's order on the theory urged by real parties, that the trial court's order "was entirely proper under the authority of [*Moore* v. *Regents of University of California* (1990) 51 Cal.3d 120 (271 Cal.Rptr. 146, 793 P.2d 479)] and Health and Safety Code section 7054.4."[4] It is self-defeating for real parties to argue, under the rationale of *Moore*, that decedent had no ownership or possessory interest in his sperm once it left his body, because the sperm then would not constitute part of Kane's estate and the probate court would not have jurisdiction over its disposition.

■ As we hereinafter explain, the decedent's interest in his frozen sperm vials, even if not governed by the general law of personal property, occupies "an interim category that entitles them to special respect because of their potential for human life" (see *Davis* v. *Davis* (Tenn. 1992) 842 S.W.2d 588, 597), and at the time of his death, decedent had an interest, in the nature of ownership, to the extent that he had decisionmaking authority as to the sperm within the scope of policy set by law. (*Ibid.*) Thus, decedent had an interest in his sperm which falls within the broad definition of property in Probate Code section 62, as "anything that may be the subject of ownership and includes both real and personal property and any interest therein."

---

[4]Section 7054.4 provides in pertinent part that "Notwithstanding any other provision of law, recognizable anatomical parts, human tissues, anatomical human remains, or infectious waste following conclusion of scientific use shall be disposed of by interment, incineration, or any other method determined by the state department to protect the public health and safety."

In *Moore*, plaintiff alleged that his physician and other defendants used his cells, excised in treatment for hairy-cell leukemia, in potentially lucrative medical research without his permission, eventually establishing and patenting a "cell line" or culture capable of reproducing indefinitely from plaintiff's cells. (51 Cal.3d at p. 127, fn. 2.) While the court held that plaintiff stated a cause of action against his physician for breach of a fiduciary duty to disclose facts material to the patient's consent or for the performance of medical procedures without first having obtained his informed consent (*id.*, at pp. 128-129), the court also held that Moore did not state a claim for conversion. "Since Moore clearly did not expect to retain possession of his cells following their removal, to sue for their conversion he must have retained an ownership interest in them. But there are several reasons to doubt that he did retain any such interest." (51 Cal.3d at pp. 136-137.)

As will be apparent from the discussion below, *Moore* is distinguishable from the instant case both because of its facts and its procedural posture. Unlike the facts in *Moore*, a contract with the sperm bank purports to evidence decedent's intent and expectation that he would in fact retain control over the sperm following its deposit. Depending upon the resolution of other matters, *Moore* may ultimately be pertinent to the disposition of some or all of Kane's stored sperm; however at this point, the pertinence of *Moore* is *speculative* as the issue of the actual disposition of decedent's sperm is not before us.

## II

### Nature of Rights in Semen

"The present legal position toward property rights in the human body is unsettled and reflects no consistent philosophy or approach. Until recently, the common law either refused to recognize a property right in human bodies or recognized only a quasi-property right. . . . [The court in *Moore* v. *Regents of University of California, supra*, 51 Cal.3d 120] did not resolve the debate over the existence or extent of a property interest in one's body. Nor does the existing statutory scheme quiet the debate. The statutes that address individuals' control over their bodies delineate the extent of that control in specific situations, but do not establish a general principle." (Note, *Personalizing Personalty: Toward a Property Right in Human Bodies* (1990) 69 Tex. L.Rev. 209, 220, fns. omitted.)

As also recognized by the court in *Moore*, "the laws governing such things as human tissues, transplantable organs, blood, fetuses, pituitary glands, corneal tissue, and dead bodies deal with human biological materials as objects sui generis, regulating their disposition to achieve policy goals rather than abandoning them to the general law of personal property. It is these specialized statutes, not the law of conversion, to which courts ordinarily should and do look for guidance on the disposition of human biological materials." (51 Cal.3d at p. 137, fns. omitted.)

Although real parties argue that Health and Safety Code section 7054.4 supports the proposition that decedent did not "own" his stored sperm, the court in *Moore* expressly stated that "It may be that some limited right to control the use of excised cells does survive the operation of this statute. There is, for example, no need to read the statute to permit 'scientific use' contrary to the patient's expressed wish." (51 Cal.3d at p. 141.) The court also explained: "Clearly the Legislature did not specifically intend this statute to resolve the question of whether a patient is entitled to compensation for the nonconsensual use of excised cells. A primary object of the statute is to ensure the safe handling of potentially hazardous biological waste material. Yet one cannot escape the conclusion that the statute's practical effect is to limit, drastically, a patient's control over excised cells." (*Id.* at p. 140, fn. omitted.)

■ Consistent with *Moore*, we conclude that the Legislature did not intend Health and Safety Code section 7054.4 to resolve the issue of the "property" rights retained by the donor of sperm, let alone the issue of insemination with the sperm of a deceased donor. These are issues separate

and apart from the issue of the paternity of a child conceived through artificial insemination, which latter issue has been addressed in state statutes modeled after the Uniform Parentage Act, as well as by the courts. (See *People* v. *Sorensen* (1968) 68 Cal.2d 280 [66 Cal.Rptr. 7, 437 P.2d 495, 25 A.L.R.3d 1093]; *C.M.* v. *C.C.* (1977) 152 N.J.Super. 160 [377 A.2d 821].)

One commentator recently noted that although some sperm banks operate as commercial enterprises, they are virtually free from state licensing and other regulation. (Wadlington, *Artificial Conception: The Challenge for Family Law* (1983) 69 Va. L.Rev. 465, 468.) The various state statutes modeled after the Uniform Parentage Act (see, e.g., Civ. Code, § 7000 et seq.) address the issue of the legal relationship between the sperm donor and the child born by artificial insemination. However, "[n]one of the statutes on artificial insemination indicate who owns the sperm donation, but sperm banks generally require those donors who are to be anonymous to sign a written waiver of any rights to the deposit and any paternity claims to children born from it. In return, the sperm bank guarantees the donor's anonymity. Thus, according to the contract between the parties, the donor no longer 'owns' the sperm. [¶] Men who use sperm banks to store their sperm for their own future use, however, do own their donation(s) of sperm and are required to pay for its maintenance and its later withdrawal. Upon notice of the death of the donor, however, many storage agreements authorize the sperm bank to dispose of the deposit. Requests from the widow of the donor to be inseminated with the sperm, as a matter of practice, are denied absent express instructions in the donor's will or a court order." (Shapiro & Sonnenblick, *The Widow and the Sperm: The Law of Post-Mortem Insemination* (1986) 1 J. Law & Health 229, 243-244, fns. omitted [discussing the language in the storage agreement used by Idant Laboratory in New York, which permits Idant, upon the death of the donor, to discard the sperm or use it in scientific research, "except that no Specimen will be used, without the Client's written consent, for the purpose of causing pregnancy by means of artificial insemination." (*Id.* at p. 243, fn. 115)].)

The American Fertility Society, in its ethical statement on in vitro fertilization, has written that "It is understood that the gametes and concepti are the property of the donors. The donors therefore have the right to decide at their sole discretion the disposition of these items, provided such disposition is within medical and ethical guidelines . . . ." (*York* v. *Jones* (E.D.Va. 1989) 717 F.Supp. 421, 426, fn. 5, citing Ethics Com. of the Am. Fertility Society, *Ethical Considerations of the New Reproductive Technologies* (1986) 46 Fertility and Sterility 89s.)

Although *Davis* v. *Davis, supra,* 842 S.W.2d 588, involved the disposition of frozen preembryos (four- to eight-celled entities)[5] of a married couple who had attempted to bear a child through in vitro fertilization but divorced before they could do so, the court's discussion of the legal status of preembryos is informative. For various reasons not pertinent to our discussion, the Supreme Court of Tennessee concluded that the preembryos could not be considered "persons" under Tennessee law. The court also refused to characterize the interest of the Davises in the preembryos as a property interest under general property law; rather they "occupy an interim category that entitles them to special respect because of their potential for human life. It follows that any interest that Mary Sue Davis and Junior Davis have in the preembryos in this case is not a true property interest. However, they do have an interest in the nature of ownership, to the extent that they have decision-making authority concerning disposition of the preembryos, within the scope of policy set by law." (842 S.W.2d at p. 597.)

The court in *Davis* found persuasive a report of the Ethics Committee of The American Fertility Society, which identified three major ethical positions that have been articulated in the debate over preembryo status. At one extreme is the view that the preembryo is a human subject after fertilization, which requires that it be accorded the rights of a person; the opposite extreme is the view that the preembryo has a status no different from any other human tissue; a third view, " 'one that is most widely held—takes an intermediate position between the other two. It holds that the preembryo deserves respect greater than that accorded to human tissue but not the respect accorded to actual persons. The preembryo is due greater respect

---

[5]According to the scientific testimony in *Davis*, the process of fertilization of the egg with the sperm results in a one-cell zygote which contains a new hereditary constitution (genome) contributed to by both parents through the union of sperm and egg; the stage subsequent to the zygote is cleavage, during which the single cell undergoes successive equal divisions with little or no intervening growth; the resulting cells, (blastomeres) become smaller, while the size of the total aggregate of cells remains the same; after three such divisions, the aggregate contains eight cells in relatively loose association; each blastomere, if separated from the others, has the potential to develop into a complete adult; " '[s]tated another way, at the 8-cell stage, the developmental singleness of one person has not been established.' " (842 S.W.2d at p. 593.)

"Today, under federal law and all state statutory law except Louisiana, embryos [created by in vitro fertilization] do not possess rights or have legal status. In Louisiana, embryos have been given rights and limits have been imposed on how embryos may be treated." (Poole, *Allocation of Decision-Making Rights to Frozen Embryos* (1990) 4 Amer. J. of Fam. Law 67, 84-85.) The Louisiana statute defines "human embryo" as "an in vitro fertilized human ovum" and prohibits its destruction unless it fails to develop further over a 36-hour period, except when the embryo is in a state of cryopreservation. (*Id.,* at pp. 78-79.) In Poole's opinion, the Lousiana statute may be unconstitutional under federal law because "it infringes on individual's right of procreative choice at a stage where the state has no compelling interest in the embryo." (*Id.* at p. 85.)

than other human tissue because of its potential to become a person and because of its symbolic meaning for many people. Yet, it should not be treated as a person, because it has not yet developed the features of personhood, is not yet established as developmentally individual, and may never realize its biologic potential.' " (*Davis* v. *Davis, supra,* 842 S.W.2d at p. 596.)

The *Davis* court also notes that The American Fertility Society suggests that " 'Within the limits set by institutional policies, decision-making authority regarding preembryos should reside with the persons who have provided the gametes. . . . As a matter of law, it is reasonable to assume that the gamete providers have primary decision-making authority regarding preembryos in the absence of specific legislation on the subject. A person's liberty to procreate or to avoid procreation is directly involved in most decisions involving preembryos.' " (842 S.W.2d at p. 597.)

■ Sperm which is stored by its provider with the intent that it be used for artificial insemination is thus unlike other human tissue because it is "gametic material" (*Davis* v. *Davis, supra,* 842 S.W.2d 588, 597) that can be used for reproduction. Although it has not yet been joined with an egg to form a preembryo, as in *Davis,* the value of sperm lies in its potential to create a child after fertilization, growth, and birth. We conclude that at the time of his death, decedent had an interest, in the nature of ownership, to the extent that he had decisionmaking authority as to the use of his sperm for reproduction. Such interest is sufficient to constitute "property" within the meaning of Probate Code section 62. Accordingly, the probate court had jurisdiction with respect to the vials of sperm.

In concluding that the sperm is properly part of decedent's estate, we do not address the issue of the validity or enforceability of any contract or will purporting to express decedent's intent with respect to the stored sperm. In view of the nature of sperm as reproductive material which is a unique type of "property," we also decline petitioner's invitation to apply to this case the general law relating to gifts of personal property or the statutory provisions for gifts in view of impending death. (See Prob. Code, § 5700 et seq.)

■ We now address the propriety of the trial court's order that the sperm be destroyed. In order to do so, we examine several theories proffered by the parties to explain or uphold the trial court's order.

In this case, the trial court could not have properly ordered the sperm destroyed by applying the provisions of the will; Hecht is not only the residual beneficiary specified therein, but the will evidences the decedent's

intent that Hecht, should she so desire, is to receive his sperm stored in the sperm bank to bear his child posthumously. Moreover, there is no indication that the trial court itself purported to apply the terms of the will or was adjudicating the issue of the validity of the will. There is also no indication in our record that the trial court's order was based upon a theory the will was invalid or subject to revocation. Although real parties' answer to the instant petition asserts affirmative defenses that the will and the sperm bank contract are invalid on the grounds that decedent was of unsound mind, subject to Hecht's undue influence, and that decedent lacked testamentary and legal capacity at the time of execution of those documents, our record contains no evidentiary hearing as to these allegations and the order cannot be upheld on these grounds.

The trial court's order also cannot be supported on the theory, urged by decedent's children, that they dismissed their will contests in connection with their execution of the First Settlement Agreement, and that the agreement and not the will governs the disposition of the sperm. Assuming only for the purpose of this argument that the "catch-all" provision of the First Settlement Agreement contemplates the disposition of the sperm, its terms would have required that 20 percent of the sperm vials be distributed to Hecht. Thus, we cannot infer that the trial court was applying the terms of the First Settlement Agreement. We also logically cannot infer that the trial court was proceeding pursuant to the terms of the Second Settlement Agreement which grants Hecht possession and control of the sperm. The trial court also acknowledged at the hearing resulting in the order to destroy the sperm that the issue of the enforceability of the Second Settlement Agreement had not yet been tried.

Real parties attempt to justify the order as premised upon the theory that even if decedent had sufficient right of possession or ownership of the sperm so as to bring it within the jurisdiction of the probate court, his *assumed intended use or disposition* of the sperm—artificial insemination of Hecht —is invalid on two purported public policy grounds: (1) public policy forbids the artificial insemination of an unmarried woman, and (2) public policy forbids artificial insemination of Hecht with the stored sperm of a deceased man.

Before addressing the merits of the public policy arguments, we must emphasize that we are not adjudicating the validity or invalidity of the will or any contract or settlement agreement at issue in this case; we also do not purport to adjudicate any claims of decedent's competence or Hecht's undue influence. For the purpose of addressing this rationale for the trial court's order, we *assume*, arguendo, a particular intention on the part of the decedent. Thus, the issues of decedent's actual intention and the right of any

party to actual distribution or possession of the sperm are not before us and must await the resolution of other issues in this case. For these same reasons, we must deny that part of Hecht's petition which seeks a writ directing the superior court to distribute the sperm to her. Such a writ is premature because many issues remain unadjudicated.

We thus proceed to address the argument that public policy forbids the artificial insemination of Hecht because she is an unmarried woman.

## III

### ARTIFICIAL INSEMINATION AND UNMARRIED WOMEN

■ Although artificial insemination in itself is not new, having been performed on animals for centuries, the first recorded successful human artificial insemination was performed in England in 1770. (Shapiro & Sonnenblick, *supra*, 1 J. Law & Health 229, 234; hereinafter Shapiro and Sonnenblick .) Although the practice was slow to be accepted in the United States until the mid-20th century, artificial insemination has now gained widespread acceptance as "medical technology has made it increasingly available and inexpensive to the estimated fifteen percent of all married couples who are infertile." (*Ibid.*, fns. omitted.) Artificial insemination was made available to the astronauts in 1961 so they could still father healthy children using stored sperm even if space travel were to harm their reproductive systems. (*Ibid.*)

By 1986, it was estimated that as many as 20,000 women each year were artificially inseminated in the United States; by one estimate, 1,500 of these women were unmarried. (*Jhordan C. v. Mary K.* (1986) 179 Cal.App.3d 386, 389, fn. 1 [224 Cal.Rptr. 530].)

In *Jhordan C. v. Mary K., supra*, 179 Cal.App.3d 386, the court interpreted Civil Code section 7005, subdivision (b), part of the Uniform Parentage Act (UPA),[6] as affording "unmarried as well as married women a statutory vehicle for obtaining semen for artificial insemination without fear

---

[6]Civil Code section 7005 provides: "(a) If, under the supervision of a licensed physician and with the consent of her husband, a wife is inseminated artificially with semen donated by a man not her husband, the husband is treated in law as if he were the natural father of a child thereby conceived. The husband's consent must be in writing and signed by him and his wife. The physician shall certify their signatures and the date of the insemination, and retain the husband's consent as part of the medical record, where it shall be kept confidential and in a sealed file. However, the physician's failure to do so does not affect the father and child relationship. All papers and records pertaining to the insemination, whether part of the permanent record of a court or of a file held by the supervising physician or elsewhere, are subject to inspection only upon an order of the court for good cause shown. [¶] (b) The donor

that the donor may claim paternity, and has likewise provided men with a statutory vehicle for donating semen to married and unmarried women alike without fear of liability for child support." (179 Cal.App.3d at p. 392.)

In *Jhordan C.*, an unmarried woman artificially inseminated herself at home with the semen of a known donor and gave birth to a child, which she wanted to raise jointly with a close woman friend; the donor obtained a paternity judgment from which the mother appealed. In affirming the judgment, the court held that "where impregnation takes place by artificial insemination, and the parties have failed to take advantage of this statutory basis for preclusion of paternity [by providing semen to a licensed physician], the donor of semen can be determined to be the father of the child in a paternity action." (179 Cal.App.3d 386, 389.)

The court in *Jhordan C.* was careful to stress "that our opinion in this case is not intended to express any judicial preference toward traditional notions of family structure or toward providing a father where a single woman has chosen to bear a child. Public policy in these areas is best determined by the legislative branch of government, not the judicial. *Our Legislature has already spoken and has afforded to unmarried women a statutory right to bear children by artificial insemination (as well as a right of men to donate semen) without fear of a paternity claim, through provision of the semen to a licensed physician.* We simply hold that because Mary omitted to invoke Civil Code section 7005, subdivision (b), by obtaining Jhordan's semen through a licensed physician, and because the parties by all other conduct preserved Jhordan's status as a member of Devin's [the child's] family, the trial court properly declared Jhordan to be Devin's legal father." (179 Cal.App.3d at pp. 397-398; italics added.)

The court in *Jhordan C.* based its conclusion that the Legislature had "already spoken" on the issue of an unmarried woman's right to artificial insemination, because "Section 7005 is derived almost verbatim from the UPA as originally drafted, with one crucial exception. The original UPA restricts application of the nonpaternity provision of subdivision (b) to a '*married* woman other than the donor's wife.' (9A West's U.Laws Ann., *op. cit. supra*, § 5 subd. (b), p. 593; . . . .) The word 'married' is excluded from subdivision (b) of section 7005, so that in California, subdivision (b) applies to all women, married or not." (179 Cal.App.3d at p. 392; original italics.) We agree with the reasoning in *Jhordan C.*; had the Legislature intended to express a public policy against procreative rights of unmarried women or

of semen provided to a licensed physician for use in artificial insemination of a woman other than the donor's wife is treated in law as if he were not the natural father of a child thereby conceived."

against artificial insemination of unmarried women, it would not have excluded the word "married" from Civil Code section 7005, subdivision (b). Colorado, Washington, Wisconsin and Wyoming have also eliminated the word "married" from subdivision (b) in their adoption of the UPA. (Shapiro & Sonnenblick, *supra*, 1 J. Law & Health 229, 240, fn. 93.)

In light of the foregoing, we reject real parties' argument that we are operating in a legal vacuum and are "free to establish policies with respect to the access of an unmarried woman to a non-coital reproductive technique (artificial insemination)."

Citing Civil Code section 4600, subdivision (a), dealing with the custody of children whose parents are separated or divorced, real parties contend that the latter "demonstrates the state's recognition that a child is better off with two living parents, whether living apart or living together, rather than with just one parent." Section 4600, subdivision (a) declares the Legislature's policy "to assure minor children of frequent and continuing contact with both parents after the parents have separated or dissolved their marriage, and to encourage parents to share the rights and responsibilities of child rearing . . . ." The foregoing statute is neither pertinent to, nor implicated in, the instant case where we are concerned with the procreative rights of an unmarried woman. Real parties fail to cite any pertinent authority which indicates that the state has a policy of preventing the formation of single-parent families. We also point out that, at this time, the issue is speculative, as it assumes that Hecht will bear a child into a single-parent family.

We also note that in a case dealing with the right of an unwed father to withhold his consent to his child's adoption by third parties, the California Supreme Court had an opportunity to comment that the state did not have a sufficiently strong interest in providing two-parent families to discriminate against unwed fathers in its application of Civil Code section 7004, subdivision (a): "We cannot conclude in the abstract that *adoption* is itself a sufficient objective to allow the state to take whatever measures it deems appropriate. Nor can we merely assume, either as a policy or factual matter, that adoption is necessarily in a child's best interest. This assumption is especially untenable in light of the rapidly changing concept of family. As recently as only a few years ago, it *might* have been reasonable to assume that an adopted child would be placed into a two-parent home and thereby have a more stable environment than a child raised by a single father. The validity of that assumption is now highly suspect in light of modern adoption practice. Recent statistics show that a significant percentage of children placed for independent adoption—7.7 percent—are adopted by a single parent. [Citation.] The figure is even higher—21.9 percent—for children

placed with agencies for adoption. [Citation.] We note that New York's high court also recently rejected the argument that the state has a sufficiently strong interest in providing two-parent families to discriminate against unwed fathers. [Citation.] [¶] If the possible benefit of adoption were by itself sufficient to justify terminating a parent's rights, the state could terminate an unwed *mother's* parental rights based on nothing more than a showing that her child's best interest would be served by adoption. Of course, that is not the law; nor do the parties advocate such a system. We simply do not in our society take children away from their mothers—married or otherwise—because a 'better' adoptive parent can be found. . . . Respondents seem to suggest that a child is inherently better served by adoptive parents than by a single, biological father but that the child is also inherently better served by a single, biological mother than by adoptive parents. The logic of this view is not apparent, and there is no evidence in the record to support such a counterintuitive view." (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 845-846 [4 Cal.Rptr.2d 615, 823 P.2d 1216].)

 Given the foregoing we also find without merit the argument of real parties that "The state's interest in protecting the institutions of family and marriage dictates petitioner should be denied access to the sperm." Clearly the institution of marriage is not implicated in this case, especially where there was no existing marriage relationship involving decedent at the time of his death and obviously there can be none after his death. (See *Jhordan C.* v. *Mary K., supra,* 179 Cal.App.3d 386, 395.) It is also premature for us to address the issue of family integrity and, in any case, there is no factual basis in this record to support any contention that the artificial insemination of Hecht would have an impact on any other family, including any family involving decedent's surviving adult children.

We thus conclude that real parties fail to establish with any pertinent authority that the public policy of California prohibits the artificial insemination of Hecht because of her status as an unmarried women.

IV

POSTMORTEM ARTIFICIAL INSEMINATION

We are aware of only one other court which has addressed the issue of the right of a woman to the sperm of a decedent. In 1984, in *Parpalaix* v. *CECOS*, the French tribunaux de grande instance ordered CECOS, a government run sperm bank in a Paris suburb, to return stored sperm of a decedent to a doctor chosen by his surviving wife. In light of the discussion in the preceding section pertaining to unmarried women, we find the *Parpalaix* case instructive and pertinent to the issue before us although it dealt

with a married couple. We glean the following facts and decision in the *Parpalaix* case from a discussion of it in Shapiro and Sonnenblick, *supra*, 1 Journal of Law and Health at pages 229-233.[7]

In 1981, Alain Parpalaix, suffering from testicular cancer, made one deposit of sperm at CECOS but left no instructions as to the future use of the sperm. At the time of the deposit, he was living with Corinne, whom he later married on December 23, 1983; as his condition was rapidly deteriorating, Alain died on December 25, 1983 at the age of 26. Corinne requested Alain's sperm deposit from CECOS, which denied the request as other centers had denied the requests of other widows. Corinne, joined by her in-laws, pursued the matter in court, where they contended that as Alain's natural heirs (spouse and parents), they had become the owners of the sperm and CECOS had broken the contract, which was in the nature of a bailment; they also argued they had a moral right to the sperm.

CECOS contended that (1) its only legal obligation was to the donor, not the wife; (2) sperm is an indivisible part of the body, much like a limb or organ and is therefore not inheritable absent express instructions; and (3) the act of depositing sperm was strictly for therapeutic purposes, to aid Alain psychologically, and giving birth was not a therapeutic matter.

"Before discussing the parties' contentions, the [court] acknowledged and briefly described the difficulties that French laws governing inheritance rights and illegitimacy would impose on a child born 'post-mortem.' By strict interpretation of the Civil Code (based on the Napoleonic Code from the early 19th Century), any child born more than 300 days after the putative father's death is deemed illegitimate. Even if the reach of the article were to be miraculously interpreted or legislatively altered to establish paternity, the child would be barred from inheriting through his father pursuant to another article of the code which states that to inherit, the child must exist at the time of death and then expressly disqualifies '[o]ne who is not yet conceived.' " (Shapiro & Sonnenblick, *supra*, 1 J. Law & Health at pp. 231-232; fns. omitted.)[8]

According to Shapiro and Sonnenblick, the French court offered no solutions to the obstacles created by the foregoing laws, but implied that,

---

[7]Shapiro and Sonnenblick obtained their information concerning the *Parpalaix* case from the Gazette du Palais, September 15, 1984, at pages 11 to 14. It is not clear whether the latter is an official or unofficial report of the trial court's opinion. At any event, Shapiro and Sonnenblick's characterization of the French court's opinion is consistent with reports of it in the English-language press. We have not been able to obtain a copy of the Gazette du Palais.

[8]In California, Probate Code section 6407 provides that "Relatives of the decedent conceived before the decedent's death, but born thereafter inherit as if they had been born in the lifetime of the decedent."

"For purposes of intestate succession, section 6408 provides the rules for determining parent-child relationships and inheritance rights. Under subdivision (c)(1), a natural parent-child relationship or paternity *is* established when there is a presumption of the parent-child

given the various new methods of procreation, the laws were outdated. The French court also expressly declined to apply ordinary contract principles raised by both parties, finding "it is impossible to characterize human sperm as movable, inheritable property within the contemplation of the French legislative scheme." (Shapiro & Sonnenblick, *supra*, 1 J. Law & Health at p. 232.) The court also disagreed with the position of CECOS that the sperm is an indivisible part of the body, characterizing sperm instead as " 'the seed of life . . . tied to the fundamental liberty of a human being to conceive or not to conceive.' This fundamental right must be jealously protected, and is not to be subjected to the rules of contracts. Rather the fate of the sperm must be decided by the person from whom it is drawn. Therefore, the sole issue becomes that of intent." (*Ibid.*; fns. omitted.) Property rights and status became irrelevant to that decision. (*Id.*, at p. 233.) The court framed the issues it had to decide as only whether Alain Parpalaix intended his widow to be artificially inseminated with his sperm and whether that intent was "unequivocable." The court found that the testimony of the widow and Alain's parents established his "deep desire" to make his wife "the mother of a common child." (*Ibid.*) CECOS did not appeal the decision of the court and Corinne was artificially inseminated in November 1984; due to the small quantity and poor quality, she did not become pregnant. (*Ibid.*)

"Although the *Parpalaix* decision has been generally acclaimed as eminently humane, it has been criticized by doctors and lawyers alike. The court's order is a victory for the widow and even for the father who can sire a child from the grave, but it may be detrimental to the child. Though the court permitted Corinne Parpalaix to continue expressing her love for Alain by bearing his child, nowhere in the *Parpalaix* decision did it address and consider the best interests of the child. Commentators have suggested that the child could suffer psychologically from being conceived by a dead man. How such psychological effects would differ from those experienced by a child born to an unmarried woman by AID [artificial insemination by donor] or a child who, at a very young age, loses his father, remains to be explained." (Shapiro & Sonnenblick, *supra*, 1 J. Law & Health at pp. 246-247; fns. omitted.)

---

relationship under Civil Code section 7004 and that presumption has not been rebutted. Subdivision (c)(2), with its 'may' language, merely allows other provisions of the Uniform Parentage Act to be used to establish a natural parent-child relationship *provided that* a court decree declaring paternity was entered while the father was alive *or* there is clear and convincing evidence that the father, while alive, had openly and notoriously held out the child as his own. . . . Therefore, here, where there is no unrebutted presumption of paternity and there is neither a court decree declaring paternity entered during Sanders's lifetime nor clear and convincing evidence that he had openly and notoriously held out Laurel as his child, section 6408 does not contemplate any means of establishing paternity." (*Estate of Sanders* (1992) 2 Cal.App.4th 462, 471 [3 Cal.Rptr.2d 536], original italics, fn. omitted.)

Echoing some of the concerns expressed by Shapiro and Sonnenblick, real parties argue that "this court should adopt a state policy against posthumous conception," because it is "in truth, the creation of orphaned children by artificial means with state authorization," a result which they characterize as "tragic." However, real parties do not cite any authority establishing the propriety of this court, or any court, to make the value judgment as to whether it is better for such a potential child not to be born, assuming that both gamete providers wish to conceive the child. In other words, assuming that both Hecht and decedent desired to conceive a child using decedent's sperm, real parties fail to establish a state interest sufficient to justify interference with that decision. As in Tennessee, we are aware of no statutes in California which contain a "statement of public policy which reveals an interest that could justify infringing on gamete-providers' decisional authority . . . ." (*Davis* v. *Davis*, *supra*, 842 S.W.2d 588, 602.)

We also disagree with real parties' claim that any order other than destruction of the sperm is tantamount to "state authorization" of posthumous conception of children, i.e., the creation of a public policy *in favor of* such conception. In such a case, the state is simply acknowledging that "no other person or entity has an interest sufficient to permit interference with the gamete-providers' decision . . . because no one else bears the consequences of these decisions in the way that the gamete-providers do." (*Davis* v. *Davis*, *supra*, 842 S.W.2d at p. 602.)

Citing *Davis*, real parties also urge this court to uphold the trial court's order on the ground that Hecht "can easily procreate by a variety of other means," and she "cannot bear a child using [decedent's] sperm without encroaching upon the family integrity of [decedent's] existing children." As pointed out above, our record is inadequate to address the issue of real parties' "family integrity."

As to the issue of whether Hecht has other means to bear a child, the issue is a factual one which our record fails to address. Moreover, it must be pointed out that the court in *Davis* was called upon to resolve a dispute involving the disposition of preembryos where the gamete-providers *disagreed* as to their disposition and where there was no written agreement of the parties or state statute governing such disposition. Under those circumstances, the court held as follows: "[W]e hold that disputes involving the disposition of preembryos produced by *in vitro* fertilization should be resolved, first, by looking to the preferences of the progenitors. If their wishes cannot be ascertained, or if there is dispute, then their prior agreement concerning disposition should be carried out. If no prior agreement exists, then the relative interests of the parties in using or not using the preembryos

must be weighed. Ordinarily, the party wishing to avoid procreation should prevail, assuming that the other party has a reasonable possibility of achieving parenthood by means other than use of the preembryos in question. If no other reasonable alternatives exist, then the argument in favor of using the preembryos to achieve pregnancy should be considered. However, if the party seeking control of the preembryos intends merely to donate them to another couple, the objecting party obviously has the greater interest and should prevail." (*Davis* v. *Davis, supra*, 842 S.W.2d 588, 604.)

Given the procedural posture of this case, and the fact that, for purposes of addressing real parties' arguments, we are assuming that decedent intended to allow Hecht to use his sperm for posthumous artificial insemination, it is premature for us to apply the *Davis* test. At this point, the only issue which we address is whether artificial insemination with the sperm of a *decedent* violates public policy. There is nothing in *Davis* which indicates that such artificial insemination violates public policy.[9]

Real parties also intimate that the birth of a child by Hecht using decedent's sperm will create psychological burdens on them, decedent's surviving adult children, as well as financial burdens on society and on the estate.

In light of the UPA and Probate Code sections 6407 and 6408, (*ante*, fn. 8), it is unlikely that the estate would be subject to claims with respect to any such children. If the Second Settlement Agreement is enforceable against Hecht, the estate may also be protected from any claims with respect to such children.

The interest of heirs and courts in the finality of probate rulings was recognized by the committee which drafted the Uniform Status of Children of Assisted Conception Act, which has been adopted in various forms in North Dakota and Virginia. Section 4 of that act provides in pertinent part that "[Except as otherwise provided in Sections 5 through 9:] . . . (b) An individual who dies before implantation of an embryo, or before a child is conceived other than through sexual intercourse, using the individual's egg or sperm, is not a parent of the resulting child." The exceptions, dealing with surrogacy agreements, are not pertinent here.

---

[9]It is only if the trier of fact determines that decedent's intent cannot be ascertained, or is contrary to Hecht's intent to bear decedent's child, that the *Davis* balancing test would be pertinent. As we have already explained, the pleadings in this case call into question the decedent's capacity, the validity of the will, the validity of the sperm bank contract, and the enforceability of the first and second settlement agreements. These issues are also inextricably bound up with the issue of decedent's intent to posthumously father a child with Hecht. Accordingly, the actual disposition of decedent's sperm is an issue which must await resolution of many other issues.

The committee comment states that "Subsection 4(b) is designed to provide finality for the determination of parenthood of those whose genetic material is utilized in the procreation process after their death. The death of the person whose genetic material is either used in conceiving an embryo or in implanting an already existing embryo into a womb would end the potential parenthood of the deceased. . . . [¶] . . . It is designed primarily to avoid the problems of intestate succession which could arise if the posthumous use of a person's genetic material could lead to the deceased being termed a parent. Of course, those who want to explicitly provide for such children in their wills may do so." (9B West's U.Laws Ann. (1987) U. Status of Children of Assisted Conception Act (1988 Act; 1993 pocket supp.) committee com. pp. 140-141.) The result in section 4(b) of the Uniform Status of Children of Assisted Conception Act appears to be consistent with application of Civil Code section 7005 and Probate Code sections 6407 and 6408 to the instant circumstances. (*Ante*, fn. 8.)

Real parties also fail to establish that the estate would be subject to a claim in the event a child born to Hecht using decedent's sperm is supported by public assistance. Civil Code section 205, which does not appear to contemplate the facts of this case, provides: "If a parent chargeable with the support of a child dies, leaving it chargeable to the county, or leaving it confined in a state institution to be cared for in whole or in part at the expense of the State, and such parent leaves an estate sufficient for its support, the supervisors of the county . . . may claim provision for its support from the parent's estate by civil action, and for this purpose may have the same remedies as any creditors against the estate, and against the heirs, devisees, and next of kin of the parent."

Decedent's adult children also fail to provide any legal or factual basis to support their contention that the birth of a child through the artificial insemination of Hecht with decedent's sperm implicates their "fundamental right to protection of their family integrity," and thus their psychological well-being.

At this point, it is also entirely speculative as to whether any child born to Hecht using decedent's sperm will be a burden on society. Real parties also offer no authority for their suggestion that if the sperm is to be distributed to Hecht, the probate court should first treat the matter as a surrogacy arrangement or adoption and appoint a guardian ad litem for the unborn child(ren) and conduct a fitness hearing as to Hecht's fitness to bear a child. We know of no authority which would authorize the probate court to proceed in the foregoing manner, much less provide it authority to address the issue of Hecht's fitness to bear a child.

As recently stated by our Supreme Court in a case involving a surrogacy contract: "It is not the role of the judiciary to inhibit the use of reproductive technology when the Legislature has not seen fit to do so; any such effort would raise serious questions in light of the fundamental nature of the rights of procreation and privacy." (*Johnson* v. *Calvert* (1993) 5 Cal.4th 84, 100 [19 Cal.Rptr.2d 494, 851 P.2d 776].)

For the foregoing reasons we conclude that the trial court abused its discretion in ordering decedent's sperm destroyed.

We emphasize again that we are not adjudicating the issues of the validity of the will, the sperm bank contract, or the enforceability of the settlement agreements in this case or any other issue not before us.

### DISPOSITION

Let a peremptory writ of mandate issue directing the superior court to (1) vacate its January 4, 1993, order, (2) enter a new order denying the "Petition for Alternative Relief [Instructions to Destroy Decedent's Frozen Sperm or Order for Preliminary Distribution of Said Sperm and Order of Determination of Whether Children Conceived from Said Sperm Shall Be Entitled to Distribution and Instructions Concerning Administration of Estate Pending Conception and Birth of Said Children]," and (3) conduct further proceedings consistent with the views expressed herein. Upon compliance with this writ, our order staying execution of the January 4, 1993, order is discharged.

Johnson, J., and Woods (Fred), J., concurred.

The petition of real parties in interest for review by the Supreme Court was denied September 2, 1993.